## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KAREN KLOTZBACH-PIPER    :
900 Rearview Place      :
Saint Marys, GA 31558     :
             :
   Plaintiff,      :
             :
  v.         :  Case No.
             :  **JURY TRIAL DEMANDED**
NATIONAL RAILROAD     :
PASSENGER CORPORATION   :
d/b/a Amtrak        :
1 Massachusetts Ave., NW   :
Washington, D.C. 20001    :
             :
SERVE ON REGISTERED AGENT: :
CT Corporation       :
1015 15th Street NW     :
Suite 1000        :
Washington, DC 20005    :
             :
   Defendant.     :
.......................................................................:

### COMPLAINT

The Plaintiff, **KAREN KLOTZBACH-PIPER**, (hereinafter, at times, "Plaintiff" or "Ms. Klotzbach-Piper"), by and through her counsel, **JONATHAN D. LEO, Esq.**, files this Complaint against the Defendant, **NATIONAL RAILROAD PASSENGER CORPORATION**, doing business as Amtrak, (hereinafter, at times, "Defendant," or "Amtrak") and states to the Court the following:

### PRELIMINARY STATEMENT

1. The Plaintiff, Karen Klotzbach-Piper, brings this action to seek damages for personal and pecuniary injuries sustained as a result of the discrimination, interference, and retaliatory acts she suffered in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, et seq. ("Title VII"), as amended, the Federal Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. ("ADEA"), as amended, the Americans With Disabilities Act of 1990, 42 U.S.C. § 12101, et seq. ("ADA"), as amended, and the Family and Medical Leave Act, 29 USC §2601 et seq. ("FMLA"), as amended.

2. The Defendant harassed and discriminated against the Plaintiff by virtue of her gender and age while she was receiving her re-certification to be an engineer. This treatment led to her seeking medical leave for anxiety. When she returned from leave, she was unlawfully denied certification as an engineer, in violation of Title VII, the ADEA, the ADA, and FMLA. Since her return, she has also been rejected from every other position she applied for with Amtrak.

3. Accordingly, Ms. Klotzbach-Piper seeks back pay, front pay, compensatory, liquidated and punitive damages, and an award of attorneys' fees and costs, and other relief as the Court may deem equitable and just.

## COMPLIANCE WITH ADMINISTRATIVE REMEDIES

4. Ms. Klotzbach-Piper filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about June 10, 2016. After numerous bureaucratic delays the EEOC concluded its administrative investigation after the parties were unable to reach an agreement in mediation. Ms. Klotzbach-Piper received a right to sue letter, dated April 24, 2018, on April 26, 2018, and the filing of this complaint has occurred within 90 days. A copy of the notice of the right to sue is attached as Exhibit A.

## JURISDICTION AND VENUE

5. The United States District Court for the District of Columbia may exercise original subject-matter jurisdiction over this case under 28 U.S.C. §1331 because it involves federal questions regarding Title VII, the ADEA, the ADA, and FMLA. An express grant of federal court

jurisdiction is found in Title VII pursuant to 42 U.S.C. §2000e-5(f)(3), the ADEA at 29 U.S.C. §626, and FMLA at 29 U.S.C. §2617.

6. Venue is governed by 28 U.S.C. §1391. Venue in this Court is appropriate because the Defendant is located in the District of Columbia and conducts its business in the District of Columbia, pursuant to 49 U.S.C. §24301(b).

## PARTIES

7. The Plaintiff, Karen Klotzbach-Piper, is a 56 year-old adult female residing in St. Marys, Georgia. The Plaintiff, at all relevant times herein, was an employee of the Defendant.

8. The Defendant, Amtrak, is a federal corporation headquartered in the District of Columbia that provides railroad service to more than five hundred (500) stations in forty-four states, and has more than five hundred (500) employees.

9. The Defendant, Amtrak, is an "employer" within the meaning of Title VII, the ADEA, the ADA, and FMLA.

## STATEMENT OF FACTS

10. Ms. Klotzbach-Piper began employment with Amtrak in 1986 and remains employed as of the time of filing of this complaint.

11. In 1998, Ms. Klotzbach-Piper became certified as a locomotive engineer and joined the union associated with her craft, the Brotherhood of Locomotive Engineers and Trainmen.

12. After approximately 12 months in this position, Ms. Klotzbach-Piper obtained a management position with Amtrak at the Consolidated National Operations Center in Wilmington, DE.

13. In March 2014, Ms. Klotzbach-Piper resigned her position in management in order to return to her previous position as a locomotive engineer.

14.  As her previous crew base had closed, she was granted leave to request a transfer to any crew base and chose Jacksonville, FL as she owned property nearby.

15.  Prior to her transfer to Jacksonville, she was warned that she would not be welcome their due to her age and gender, as the men in Jacksonville "don't have or want any women on their locomotives."

16.  At the time, Ms. Klotzbach-Piper was not too concerned as she had faced similar biases at her previous engineering stint as she was one of the few women hired into the engineer's program in the Midwest.

17.  Ms. Klotzbach-Piper began the process to be a re-entry engineer by attending the Amtrak Training Center for 7 weeks to obtain her up-to-date engineer's license. She was placed in a class where the engineers were all new to the craft.

18.  After successfully completing Locomotive Engineer Training School on May 19, 2014, Ms. Klotzbach-Piper contacted Road Foreman Richard Nunziato ("Nunziato") to advise him that she was prepared to report to Jacksonville. She was instructed by Nunziato to report to the Jacksonville Crew Base for orientation at 9:00 am, on May 26, 2014.

19.  She reported as instructed on that date but there was no management at the base. At 4:50 pm Road Foreman Matt Reinert ("Reinert") arrived and indicated he was extremely surprised to find her still there. He then proceeded to do a quick introduction to the crew base and expectations she would be required to meet.

20.  During this time, Reinert told Ms. Klotzbach-Piper that she was a "Student Engineer and would be treated as so." She would need to meet all the requirements that a student engineer had to meet even though she had been a fully certified Class 1 Engineer previously in her career. He even took the time to point out that her Engineer Certification classification was student.

4

21. She received daily evaluations by a peer engineer that was specially trained to handle student engineers; her initial On The Job Training Instructor ("OJTI"), DSLE would be Bryan Morrison ("Morrison"). She was further instructed to report to work on May 27, 2014 to prepare her books, bulletins and orders to begin the qualifying trials as not all of the information was available to her as she did not have access to the CSX computer System.

22. In June 2014, she attended the required rules classes for CSX and passed all of the tests that were required pursuant to Federal Railroad Administration, Amtrak, and CSX standards. She also completed a pre-qualification territory test in order to operate the trains as she had only been observing the territories from the second engineer's seat until that point.

23. On June 26, 2014, Nunziato performed a skills performance test on Ms. Klotzbach-Piper. This evaluation was more informal, so that the parties could get to know one another, talk about rules, signals and general operating procedures. She did not operate the train as she had not taken a preliminary PC segment test and Nunziato wanted to make sure she had logged ride time.

24. Ms. Klotzbach-Piper received a score of two for this trip, which demonstrates that she fulfils all requirements for skills and knowledge.

25. During this initial period, there were times when William Robinson, Engineer of Record ("EOR"), and Morrison would have Ms. Klotzbach-Piper operate the train and they would radio to see if there were complaints about her operation of the train. The conductor, William Billy ("Billy"), would criticize their operation of the train and not her.

26. Billy insulted Ms. Klotzbach-Piper and called her a "carpet bagger." He would tell her that she should rent a house instead of buying because she wouldn't be staying that long.

27. Throughout June and July 2014, Ms. Klotzbach-Piper had to take several trips off due to hotel shortages in Florence, SC and Hamlet, NC. She did this rather than having to stay in a crew room and return to Jacksonville with a different crew and no rest time.

28. In August 2014, Reinert suggested that Ms. Klotzbach-Piper concentrate on the Florence territory only and that would put her with engineers Philip Shaw ("Shaw") and Christopher Martone ("Martone") to assist her in training so she could become qualified on that territory more quickly. He asked her to have Nunziato approve the change.

29. Ms. Klotzbach-Piper spoke with Nunziato in August 2014 and let him know the difficulty she was having with making both sides of the routes due to having so many breaks because of the hotel room shortages. They agreed that she would only qualify on the Florence side first.

30. Her qualifying schedule from departing Jacksonville to Florence with Robinson and Morrison once a week and departing Jacksonville to Florence with Shaw and Martone on the second trip of the week. This very quickly became an unhealthy, unbearable hostile work environment for her with Shaw and Martone.

31. While qualifying in September and October 2014 with Shaw and Martone they would scream things at Ms. Klotzbach-Piper such as "44, 44 gonna get me some cold cuts," and they would hit the back of her seat with a flagging stick when she was operating the train to break her concentration. It was a constant barrage of degrading and mean treatment because she was a woman and older than they were. She was constantly told she had "CRS" Can't remember shit syndrome. She was also told that she "didn't belong there because it was a man's job," and why didn't she "just become a ticket agent that way she could wear a skirt." She was told she "ran a

train like a grandmother, oh yeah that's what you are." If she asked a question she was told she was stupid and should just give up and take a disability for having Alzheimer's.

32. Ms. Klotzbach-Piper spoke with her Union representative, Leroy Yeartie ("Yeartie"), regarding these issues and he spoke with management and stated that this would be addressed. He also said that this was similar behavior exhibited towards other women who tried to qualify in Jacksonville.

33. Shaw and Martone did not stop their behavior and in fact acted in a worse fashion. Shaw kicked Ms. Klotzbach-Piper while she was in the engineer's seat operating the train. In addition, Shaw and Martone would reach across her to "show her how to operate" while brushing their hands and/or arms up against her chest. They would make comments like "oh, it's really close quarters in here" and laugh. Martone was constantly making rude remarks and say things that were sexual in nature then laughing. If she were smiling he'd ask how she "got it" the night before. He would make comments about the size of her breasts and Shaw would laugh. The situation was becoming unbearable and made training almost impossible.

34. In October 2014, Ms. Klotzbach-Piper went to Nunziato and informed him of the treatment she was receiving from Shaw and Martone. Due to his schedule, Nunziato was unable to ride with Ms. Klotzbach-Piper until November 23, 2014 so he could not witness it firsthand. However, Nunziato and Plaintiff had several conversations about the way she was being treated by Shaw and Martone.

35. The conductor on the crew, Helen Gage-Williamson ("Gage-Williamson"), also stepped forward in support of what Ms. Klotzbach-Piper was saying concerning female treatment on the crew by these two men. Nunziato's response was they were both young and immature and to get a pair of earplugs, and that she should just suck it up and get qualified.

36.    Near the end of October 2014, Ms. Klotzbach-Piper went to the Assistant Superintendent, Kevin Banks ("Banks"), after Shaw and Martone started making comments about Gage-Williamson and her.  Shaw and Martone asked if they were lesbians and could they watch them have sex.

37. Gage-Williamson would try to encourage Ms. Klotzbach-Piper by sympathizing about the treatment these two engineers were known for.  Gage-Williamson also stated that her operation of the train was not bad and that she didn't run a train any different than the men did.

38.    Banks was also very sympathetic to what Ms. Klotzbach-Piper was experiencing because he had been treated in a similar fashion as a black man coming into the crew base.  He explained that anyone who was not a white male was treated differently and he would speak to Nunziato and Reinert about stopping the treatment.

39.    On November 7, 2014 after arriving back into Jacksonville, Shaw and Ms. Klotzbach-Piper sat down at the picnic table outside the crew room to have a discussion about his treatment and training methods of Ms. Klotzbach-Piper.  Nunziato was standing nearby and told Shaw he needed to see that Ms. Klotzbach-Piper was being given correct information.  He stated that if Martone was being disruptive that Shaw should tell him to ride the second locomotive.  Shaw made the comment that "she'd," referring to Ms. Klotzbach-Piper, will ride the second locomotive before he'd make a real engineer ride it.  Ms. Klotzbach-Piper got up from the table and left, and as she walked away, Shaw called her that "fucking bitch" and stated he could not wait for the rollover in December so he didn't have to deal with her because he was bidding off the job.

40.    The situation did not improve.  Ms. Klotzbach-Piper would come home from many trips throughout November and December 2014 with bruises on the back of her calf and top of her left thigh from where she was kicked by Shaw while operating the trains.

8

41. Prior to Christmas 2014, Martone gave Ms. Klotzbach-Piper a card that had a mean-spirited and offensive poem in it. The poem went "There once was a trainee, whom sometimes didn't listen. That worried the crew, from the crossings she's missing. The slack would run in and out all damn night the whistle posts she blew were nowhere in sight. Her ups and her downs were all in reverse "Put the radio down!" and run the train first!!" And the slack would run in, as she dropped into idle. And to calm the QBU's rage? Not even a midol. But then a glimmer of hope as the years went by. And when she marked up she started to sigh. Mr. "well back in 1962" was on her new crew. And she finally told him like us all "SHUT THE F UP!!" too… Happy Holiday Chris."

42. In January 2015, Ms. Klotzbach-Piper lodged a formal complaint with Yeartie. He contacted the local management and stressed that their lack of action to rein in the two engineers was creating a hostile work environment and needed to stop.

43. The harassment continued as the information reported was repeated back to the men involved. Ms. Klotzbach-Piper's books, bulletins and orders were stolen, her personal suitcase was ransacked and her notes were stolen.

44. Gage-Williamson left for a different crew base on the following rollover after having worked that job for 8 years in part because of the treatment.

45. In January 2015, Ms. Klotzbach-Piper was placed on a new schedule with Martone and Mr. Sharif Ahmed ("Ahmed"). Mr. Ahmed had a very different style of operating a train and did not allow talking in the locomotive except for calling signals. If Ms. Klotzbach-Piper had a question, she had to wait until they reached Florence or Jacksonville to ask it.

46. Unfortunately, Martone's comments continued and Ahmed would tell him to knock it off occasionally, but if Ms. Klotzbach-Piper responded in any way to Martone, she was treated

differently and sent to the second locomotive at the next stop. Ms. Klotzbach-Piper was treated differently because she was a woman.

47. Ms. Klotzbach-Piper attempted to learn from Ahmed but her questions were responded to with "you should know this by now." She told Ahmed that the reason "trainees were placed with different engineers was to give them a variety of running styles to find the one that was comfortable for them, and asking questions was the way to learn those styles." His response was to figure it out for herself.

48. Ms. Klotzbach-Piper spoke to Yeartie on several occasions concerning the "silent" treatment. Yeartie said he had spoken to Ahmed with no change.

49. In February 2015, Ms. Klotzbach-Piper again complained to Banks, but nothing changed.

50. In March and April 2015 Robinson and Morrison knew Ms. Klotzbach-Piper was experiencing harsh harassment from the other crew and both offered to help her during their lay over time. Robinson showed Ms. Klotzbach-Piper how to draw the entire route and how to create memory reminders. Morrison sat with Ms. Klotzbach-Piper and tested her on the mile posts, control points, speed changes, rule application and other physical characteristic. This was exactly the types of training Ms. Klotzbach-Piper should have been receiving all along, and would have if she was a male and younger.

51. For the most part the locomotive remained silent when operating with Ahmed. Ms. Klotzbach-Piper was no longer allowed to operate with notes or speak while operating except to call signals or speak on the radio.

52. On May 1, 2015 Reinert rode with Ms. Klotzbach-Piper to evaluate her and stated at the end of that trip she was right on target to qualify. He said that he would not need to ride with

her between Jacksonville and Savannah as she knew that territory extremely well but needed to concentrate on Jacksonville to Florence.  He gave her all twos on the evaluation with only one three.  He also stated that she needed to humble herself when operating with Ahmed because he didn't appreciate her attitude.

53.  Prior to this evaluation Ms. Klotzbach-Piper had lunch with some of her crew members as well as several from the Auto-Train, which is Mr. Reinert's normal territory. During lunch, the other crew members asked how Ms. Klotzbach-Piper felt being a mother and having to deal with a Road Foreman Engineer ("RFE") (Reinert) that was a registered sex offender.

54.  Ms. Klotzbach-Piper stated that if that were true he wouldn't be in management at Amtrak and it was truly an unkind thing to say about someone.  At that time one of the other people at the table pulled his cell phone out and brought up the Florida Sex Offenders Registry and put Matt Reinert into the search; up came a picture of Reinert.

55.  Ms. Klotzbach-Piper was stunned and stated that as the grandmother of two little girls who were sexually attacked by a pedophile, Reinert didn't deserve to be walking around breathing the same air, let alone being a manager in a company that cultivates a family atmosphere.  Ms. Klotzbach-Piper kept this conversation to herself as she did not know all the facts in his case until she later found out that one of the people at the table had repeated what she had to say about. Reinert to him.

56.  Ms. Klotzbach-Piper asked Martone about this when she returned to work one evening, and he said that it was true.

57.  The next day Ms. Klotzbach-Piper called the General Chairman for the Union and asked him about the situation.  He stated that it was true and Reinert had gotten his job back at Amtrak by the Labor Board due to having served his entire sentence in prison and was not on

parole when he was released.  As an engineer, he was allowed to only be in the locomotive therefore, he would have no contact with passengers.

58.  Ms. Klotzbach-Piper told the General Chairman that she had seen him on the platform and in his office with more than one young teenaged boys, and asked how could he have been promoted into management.  The General Chairman stated that Reinert had many "friends" in the executive level of management and there was nothing the union could do about it.

59.  The next time Ms. Klotzbach-Piper saw Reinert on the platform with a young man about the age of 14-15 years old, she went to Nunziato and informed him.  He shrugged and told her it was best if she just kept her mouth shut because Reinert would be the road foremen to qualify her since Nunziato had yet to qualify on any of the territory (Nunziato had been in Jacksonville for at least 3 years by this time).

60.  Ms. Klotzbach-Piper was surprised by his response and felt like it was a threat.

61.  On July 12, 2015, Reinert rode with Ms. Klotzbach-Piper for the purpose of certification, and Reinert was agitated with her for no apparent reason associated with her performance.

62.  On July 14, 2015, Reinert rode with Ms. Klotzbach-Piper again for the purpose of certification.  After the trip Reinert suggested another few trips would give her the extra "confidence" she needed.  He proceeded to tell her he wanted her to feel completely confident prior to him riding with her again between Jacksonville and Savannah as she had been concentrating on the territory north of Savannah which in his opinion she was good to go on. She did not receive a copy of an evaluation at that time.

63.  On July 15, 2017, Ms. Klotzbach-Piper spoke with Yeartie about the two recent evaluations and he assured her that he would speak to Reinert.

64. Upon information and belief, Yeartie and Engineer Drewe's met with Reinert on July 16, 2015 and discussed her performance trip. Reinert told them that he found no reason to fail her but just felt an additional month of qualifying would be better for her overall.

65. Ms. Klotzbach-Piper had a conference on Friday, July 17, 2015 with both Reinert and Nunziato to discuss her performance. During this conference Reinert asked her if she questioned the judgement of another engineer as he had come to Reinert and complained. She stated that she had told Ahmed that he had missed a spot for proper braking, and that Martone hadn't noticed because he was asleep.

66. After the conference ended, Reinert told Ahmed and Martone what she had said.

67. Ms. Klotzbach-Piper attended Amtrak Rules Block Training in Jacksonville the week of July 20 to July 23, 2015. She passed all of the requirements of the class. On the last day of class, Nunziato and Reinert asked her to return to the classroom where they proceeded to give her a letter dated July 23, 2015.

68. The letter cited a "Territorial Qualification Policy for Jacksonville/Miami Zone 6" ("TQP") and stated that pursuant to this policy, she had exceeded the number of qualifying attempts and would be given 30 days (unpaid) to qualify. The letter was signed by Nunziato.

69. The letter was the first time she had received notice that she had failed the qualifying trip on July 12, 2015.

70. This was also the first time she heard of the alleged TQP and asked why she had not been told about it. She also asked what she had failed, why she was being treated as a fully qualified engineer and not being held for the Hours Qualifications for new engineers, and why she was not evaluated each month by management as the rules require. The questions were not answered and she was told that she might want to get into contact with her union representative.

71. At the conclusion of the meeting, Reinert and Nunziato both stated they would be more than willing to assist her in any way possible to successfully pass her proficiency testing including taking extra trips with her and reining in some of the "nonsense" that the crews had been inflicting upon her. Apparently, these types of incidents were to be expected and in no way should have "affected" her the way she felt they had. She was told by Nunziato to report to the base by noon on July 25, 2015 to set up a schedule for further qualification. The promises to help were false.

72. As Ms. Klotzbach-Piper was standing outside in the parking lot putting her things away, Reinert walked past her and said "You should have just kept your mouth shut."

73. After this conference, Ms. Klotzbach-Piper spoke with the General Chairman and he told me he had never signed the TQP and that it was an initial draft of something presented to the union but never agreed upon. He said it would be straightened out and he and Yeartie would see to it that Amtrak understands that Appendix K superseded any TQP. Ms. Klotzbach-Piper was led to believe that she would be given the additional 30 days and be paid as well as have the appropriate accommodations and the assistance she needed to qualify.

74. Ms. Klotzbach-Piper arrived at the base at 11:25 am on July 25, 2015 and found no managers able to assist her in setting a schedule. She was also told that Reinert and Nunziato were unavailable to ride with her.

75. For the next several weeks, Ms. Klotzbach-Piper worked without pay or reimbursement for hotels while the union and Amtrak attempted to resolve the issue.

76. On or about August 22, 2015 Ms. Klotzbach-Piper received a letter stating that she would be riding with Nunziato for an evaluation on August 26, 2015.

77. Ms. Klotzbach-Piper contacted Yeartie upon receipt of the letter and he said that Nunziato would not be riding with her until she received additional training.

14

78.   Upon arriving to work on August 26, 2015, she was told by Nunziato that she would be riding with him today and that the union did not run the base, he did.

79.   On her way to the train, Martone stated he was on his way to the ticket office to see if they still had any job openings as Ms. Klotzbach-Piper would need one after this trip. Upon climbing on the locomotive, Nunziato said to enjoy departing Jacksonville On-time because it would be her last.

80.   There was an incident just north of the Jessup stop concerning the 25 MPH speed restriction.  Ms. Klotzbach-Piper started early for the reduction as she was being as cautious as possible and realized the brakes had grabbed harder than expected.  She released the brakes and started to soft set them for the last 5 MPH reduction from 30MPH to 25 MPH when Nunziato asked "isn't this a 25 MPH not 30MPH?"  She continued to set the brakes to suppression and release them.  She operated through the temporary speed restriction and continued to operate north for approximately 10" when Nunziato turned and said he had to take her out of the seat and to allow Ahmed to operate the remainder of the trip.

81.   Nunziato and Ms. Klotzbach-Piper detrained at Savannah and were cabbed back to Jacksonville where he stated he would contact her when he figured out what he wanted to do with her.

82.   Ms. Klotzbach-Piper was devastated by how she was treated on this ride, as well as all of the others.  She immediately made a doctor's appointment as she was not feeling well.

83.   On August 28, 2015, Ms. Klotzbach-Piper met with a doctor and was diagnosed with PTSD and anxiety, and began seeking treatment.  The doctor told her not to return to work until further notice.

84. In September 2015, Ms. Klotzbach-Piper received a Cobra termination letter in the mail and was told she no longer had any medical insurance because she had not "worked for pay" enough days in August 2015. At the time, she was already on sanctioned medical leave under FMLA.

85. Ms. Klotzbach-Piper spoke with the Superintendent for the Southern Region, Scott Kenner, who promised to look into the situation. He called her back a few days later and stated that her medical insurance would be reinstated and that she was not removed from service and that Nunziato would work with her when she returned to work.

86. In November 2015, Ms. Klotzbach-Piper sent the proper paperwork to Jacksonville in care of Nunziato who never forwarded it to Amtrak Medical for an extension of medical leave from November 7, 2015 until at least December 3, 2015 when she had a follow up appointment with my primary care physician. On December 2, 2015 there was a letter sent to her from Amtrak Medical saying that they had never received the extension documents.

87. On December 3, 2015, Ms. Klotzbach-Piper was given a return to work clearance after completing a drug regiment, counseling and overall physical from her physician. She was advised that she would be back by Thursday, December 10, 2015.

88. On December 10, 2015, Ms. Klotzbach-Piper received an email from Nunziato stating that he was evaluating her situation and would notify her when it was complete. He did not elaborate despite being asked by her.

89. On December 17, 2015, Ms. Klotzbach-Piper filed a complaint regarding her treatment with Amtrak President Mr. Joseph Boardman ("Boardman").

90. On January 11, 2016, Ms. Klotzbach-Piper received a letter from Amtrak's Equal Employment Opportunity Compliance Office that they were investigating her complaint.

16

91.   On January 13, 2016, Ms. Klotzbach-Piper received a letter from Amtrak stating that she has not demonstrated the necessary skills to retain certification as an engineer with Amtrak. The letter did not terminate her employment.

92.   Ms. Klotzbach-Piper attempted to appeal the decision but was denied.

93.   Ms. Klotzbach-Piper attempted to use the internal EEOC with Amtrak to resolve the dispute, but when they proved uncooperative, she filed with the EEOC on or about June 10, 2016.

94.   Unfortunately, there were several bureaucratic delays that were not the fault of Ms. Klotzbach-Piper, and the EEOC did not begin its investigation until significantly after the filing.

95.   On or about April 26, 2018, Ms. Klotzbach-Piper received a right to sue letter.

96.   Since Ms. Klotzbach-Piper received the January 13, 2016 letter denying her certification, she has applied for dozens of other jobs with Amtrak, including positions that she previously held.  She has been denied for all of them.

## CAUSES OF ACTION

### COUNT I
### (HOSTILE WORK ENVIORNMENT- TITLE VII- GENDER DISCRIMINATION)

97.   The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 96, and all subsequent allegations of facts, as though set forth fully and at length herein.

98.   Ms. Klotzbach-Piper is a female, and as such, is a member of a protected class under Title VII.

99.   Ms. Klotzbach-Piper suffered from unwelcome harassment, including but not limited to, insulting comments, inappropriate touching, and constant belittling.

100.  The harassment was based on her gender, as evidenced by the sexist nature of the remarks and the inappropriate touching.

101.  Ms. Klotzbach-Piper made frequent complaints to Amtrak's management about her treatment and Amtrak did nothing to address the matter.

102.  The harassment was severe and pervasive enough that she had to go on medical leave to deal with the stress.  It continued after she returned from medical leave and ultimately resulted in Amtrak denying her certification as an engineer.

103.  As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain the necessary certification for her position and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT II

## (HOSTILE WORK ENVIORNMENT- ADEA- AGE DISCRIMINATION)

104.  The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 103, and all subsequent allegations of facts, as though set forth fully and at length herein.

105.  Ms. Klotzbach-Piper is 56 years-old, and as such, is a member of a protected class under the ADEA.

106.  The harassment was based on her age, as evidenced by the nature of the remarks referring to her as "old" and "grandmother."

107.  Ms. Klotzbach-Piper made frequent complaints to Amtrak's management about her treatment and Amtrak did nothing to address the matter.

108.  The harassment was severe and pervasive enough that she had to go on medical leave to deal with the stress.  It continued after she returned from medical leave and ultimately resulted in Amtrak denying her certification as an engineer.

109.  As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain the necessary certification for her position and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT III

### (GENDER DISCRIMINATION-TITLE VII)

110.  The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 109, and all subsequent allegations of facts, as though set forth fully and at length herein.

111.  Ms. Klotzbach-Piper is a female, and as such, is a member of a protected class under Title VII.

112.  Ms. Klotzbach-Piper was treated differently than her similarly situated male colleagues.  She was not given the same training as them, was held to a higher standard, and was subjected to constant ridicule because she was a woman in a male workplace.

113.  Defendant refused to certify her as an engineer and placed her on unpaid leave because she was a woman.

114.  As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain the necessary certification for her position and suffered monetary damages,

including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT IIV

## (AGE DISCRIMINATION- ADEA)

115.   The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 114, and all subsequent allegations of facts, as though set forth fully and at length herein.

116.   Ms. Klotzbach-Piper is 56 years-old, and as such, is a member of a protected class under the ADEA.

117.   Ms. Klotzbach-Piper was treated differently than her similarly situated younger colleagues.  She was not given the same training as them, was held to a higher standard, and was subjected to constant ridicule because she was older.

118.   Defendant refused to certify her as an engineer and placed her on unpaid leave because she of her age.

119.   As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain the necessary certification for her position and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT V

**(RETALIATION FOR PLAINTIFF EXERCISING RIGHTS UNDER TITLE VII-PRIOR**

**TO FILING FORMAL EEOC CHARGE IN JUNE 2016)**

120.   The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 119, and all subsequent allegations of facts, as though set forth fully and at length herein.

121.   Ms. Klotzbach-Piper made several complaints to Amtrak management about the sexual harassment she was experiencing, including a formal complaint with the CEO of Amtrak on or about December 17, 2015.  Her complaints are protected behavior under Title VII.

122.   After she filed her complaint, and two days after Amtrak said they would investigate the matter, Amtrak denied her certification.

123.   This denial was due to her filing complaints against Amtrak regarding sexual harassment.

124.   As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain the necessary certification for her position and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

**COUNT VI**

**(RETALIATION FOR PLAINTIFF EXERCISING RIGHTS UNDER TITLE VII-**

**AFTER FILING EEOC CHARGE IN JUNE 2016)**

125.   The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 124, and all subsequent allegations of facts, as though set forth fully and at length herein.

126.   Ms. Klotzbach-Piper filed a formal charge with the EEOC in June 2016, a protected activity under Title VII.

127.   After she filed the charge, she continued to search and apply to other positions within Amtrak.

128.   She was rejected from every position she applied to without a reasonable justification or explanation.   She was even rejected from a previous position that she had excelled at and was told in the rejection that she was not qualified.

129.   These rejections were because she filed a charge with the EEOC under Title VII.

130.   As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain any other positions with Amtrak and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT VII

## (RETALIATION FOR PLAINTIFF EXERCISING RIGHTS UNDER ADEA-PRIOR TO FILING FORMAL EEOC CHARGE IN JUNE 2016)

131.   The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 130, and all subsequent allegations of facts, as though set forth fully and at length herein.

132.   Ms. Klotzbach-Piper made several complaints to Amtrak management about the harassment she was experiencing due to being an older employee, including a formal complaint with the CEO of Amtrak on or about December 17, 2015.   Her complaints are protected behavior under the ADEA.

133.  After she filed her complaint, and two days after Amtrak said they would investigate the matter, Amtrak denied her certification.

134.  This denial was due to her filing complaints against Amtrak regarding her treatment due to her age.

135.  As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain the necessary certification for her position and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT VIII

## (RETALIATION FOR PLAINTIFF EXERCISING RIGHTS UNDER ADEA- AFTER FILING EEOC CHARGE IN JUNE 2016)

136.  The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 135, and all subsequent allegations of facts, as though set forth fully and at length herein.

137.  Ms. Klotzbach-Piper filed a formal charge with the EEOC in June 2016, a protected activity under the ADEA.

138.  After she filed the charge, she continued to search and apply to other positions within Amtrak.

139.  She was rejected from every position she applied to without a reasonable justification or explanation.  She was even rejected from a previous position that she had excelled at and was told in the rejection that she was not qualified.

140.  These rejections were because she filed a charge with the EEOC under the ADEA.

141. As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain any other positions with Amtrak and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT IX

### (VIOLATION OF PLAINTIFF'S RIGHTS UNDER ADA)

142. The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 141, and all subsequent allegations of facts, as though set forth fully and at length herein.

143. In September 2015, Ms. Klotzbach-Piper went on medical leave with a mental disability that substantially limits a major life activity.

144. Ms. Klotzbach-Piper was diagnosed with PTSD and anxiety, and was unable to handle stressful environments.

145. Ms. Klotzbach-Piper received treatment for this disability, and was able to resume her training in December 2015, though she still suffered from it.

146. Amtrak refused to certify her as an engineer because of her disability.

147. As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain the necessary certification for her position and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

## COUNT X

**(RETALIATION FOR PLAINTIFF EXERCISING RIGHTS UNDER FMLA)**

148.    The Plaintiff hereby incorporates by reference the facts set forth in paragraphs 1 through 147, and all subsequent allegations of facts, as though set forth fully and at length herein.

149.    Ms. Klotzbach-Piper requested and was granted medical leave under FMLA, a statutorily protected action.

150.    After Ms. Klotzbach-Piper was approved by her doctor to return to work, she was notified that Amtrak was evaluating what to do with her situation.

151.    Amtrak ultimately denied her certification as an engineer as a consequence of using FMLA.  This happened immediately after her return to work.

152.    As a direct and proximate result of the Defendant's actions, Ms. Klotzbach-Piper was unable to obtain the necessary certification for her position and suffered monetary damages, including, but not limited to, lost wages, lost benefits, and damage to her personal and professional reputation.

WHEREFORE, the premises considered, the Plaintiff demands relief as specified hereinafter.

**RELIEF REQUESTED**

WHEREFORE, the premises considered, the Plaintiff, **KAREN KLOTZBACH-PIPER**, demands judgment against the Defendant, granting the following relief as to all counts such that the Court:

a.      Award to Plaintiff her lost income (both back pay and front pay, at an appropriate salary) together with other employment benefits (including, but not limited to, health benefits and retirement benefits), in excess of $75,000.00, in an amount to be proven at trial;

b.      Award to Plaintiff compensatory damages, in excess of $75,000.00, in an amount to be proven at trial;

c.      Award to Plaintiff punitive damages in an amount to be proven at trial;

d.      Award to Plaintiff liquidated damages in an amount to be proven at trial;

e.      Award to Plaintiff pre-judgment and post-judgment interest;

f.      Award to Plaintiff her reasonable attorneys' fees and costs and disbursements associated with prosecution of this action; and

g.      Such other and further relief as this Court may deem just and proper.

**THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

I, **KAREN KLOTZBACH-PIPER**, do hereby solemnly declare and affirm under the penalties of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

17 July 2018
**DATE**

**KAREN KLOTZBACH-PIPER**

Respectfully submitted,

LAW OFFICES OF JONATHAN LEO, LLC.

By: _____
Jonathan D. Leo, Esq.
Bar No: 1023572
4550 Montgomery Avenue
Suite 760N
Bethesda, Maryland 20814
(301) 951-1530
jleo@leolawoffices.com
Counsel for Plaintiff

### DEMAND FOR JURY TRIAL

The Plaintiff demands a jury trial in this action.

Jonathan D. Leo, Esq.