## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| KAREN KLOTZBACH-PIPER, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-1702 (RC) |
| | : | | |
| v. | : | Re Document No.: | 29 |
| | : | | |
| NATIONAL RAILROAD PASSENGER | : | | |
| CORPORATION, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Karen Klotzbach-Piper alleges that she suffered regular mistreatment at the hands of two coworkers while she was training to become a locomotive engineer. They called her names, hit her when she operated the train, and touched her inappropriately. The mistreatment ended when one of the coworkers changed jobs. Several months later, however, Klotzbach-Piper failed to qualify as a certified engineer. She now brings a variety of discrimination claims against her employer, the National Railroad Passenger Corporation, more commonly known as Amtrak. Amtrak moves for summary judgment. It is entitled to summary judgment on most of her claims. But Klotzbach-Piper may present her two hostile work environment claims to a jury.

## II. BACKGROUND

Klotzbach-Piper worked at Amtrak in a variety of roles for almost thirty years. Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ("Def.'s SMF") ¶¶ 8–9, 13, ECF No. 29-1. After eleven years in clerical, dispatching, and operations positions, she became a certified locomotive engineer. *Id.* ¶ 9. Right after obtaining her certification, however,

she took a job as a systems operations duty officer in Amtrak's Consolidated National Operations Center.  *Id.* ¶ 13.  She stayed in that job for fifteen years and let her locomotive engineer certification lapse.  *Id.* ¶ 15.

In March 2014, Klotzbach-Piper bid for a position as a locomotive engineer in Jacksonville, Florida because she planned to retire in a nearby town.  *Id.* ¶¶ 17, 19–20.  She retained union seniority from her previous stint as an engineer, so she won the position.  *Id.* ¶ 22. A condition of the job was that she be recertified as a locomotive engineer.  *Id.* ¶ 23.  A certified locomotive engineer must be certified in general and qualified on her assigned routes.  *Id.* ¶ 10. Amtrak cannot certify an engineer who has not demonstrated that she possesses the skills to safely operate a train.  *Id.* ¶ 34; 49 C.F.R. § 240.211(a).  And to qualify on a route, an engineer must memorize the route's physical characteristics—such as bridges or inclines—and speed restrictions.  Def.'s SMF ¶ 32.  Amtrak had Klotzbach-Piper train on only one of the two routes out of Jacksonville: the Jacksonville-Florence route.  *Id.* ¶ 38.

To prepare for certification, Klotzbach-Piper received classroom and on-the-job training. *Id.* ¶¶ 24, 30.  Her on-the-job training included observing other engineers and operating a locomotive herself under a training instructor's supervision.  *Id.* ¶ 30.  Training instructors regularly reviewed her performance using scored evaluation forms.  *Id.* ¶¶ 45–46.  Klotzbach-Piper worked with two training instructors at any given time.  Pl.'s Dep. at 67:14–15, ECF No. 29-4.  One of her trainers was Brian Morrison, whom Klotzbach-Piper described as a "pretty good instructor."  Def.'s SMF ¶¶ 42, 44.  Beginning in September 2014, her other trainer was Phillip Shaw.  *Id.* ¶ 55.  Shaw changed jobs in February 2015 and was replaced by Sharif Ahmed.  *Id.* ¶ 59.  Klotzbach-Piper would ride with each trainer for one trip a week.  *Id.* ¶ 56.

During Klotzbach-Piper's qualifying period, road foremen Richard Nunziato and Matthew Reinert accompanied her on certain trips to evaluate her performance. *Id.* ¶¶ 60–61. They too filled out scored evaluation forms, but their forms were different than the ones that training instructors used. *Id.* ¶¶ 61–63. Road foremen's evaluations are meant to determine whether a locomotive engineer should qualify on a route. *Id.* ¶ 62. In addition to evaluating Klotzbach-Piper for qualification, Nunziato was her direct supervisor. *Id.* ¶ 41.

Klotzbach-Piper alleges that, when she rode with Shaw, he and another engineer, Christopher Martone, tormented her. Among other things, they called her names like "bitch" and "grandmother," kicked her or hit her with a flagging stick while she was operating the train, and brushed up against her breasts unnecessarily. *See id.* ¶ 119; Mian Decl., Ex. 5 ("Pl.'s Interview Notes") 01/19/2016 ¶¶ 14, 36, 45, ECF No. 29-3.[1] Klotzbach-Piper says that she complained to Nunziato on several occasions. *See* Pl.'s Interview Notes 01/19/2016 ¶¶ 10–11; Pl.'s Dep. at 128:1–18; Def.'s SMF ¶ 120. She claims that, in January 2015, she filed a formal complaint through her union representative that made its way to Nunziato, Reinert, and Jacksonville Assistant Superintendent Kevin Banks. *See* Pl.'s Interview Notes 01/19/2016 ¶ 11; *id.* 05/17/2016 ¶ 20; Pl.'s Dep. at 128:1–18. According to Klotzbach-Piper, Nunziato spoke with Shaw and Martone but later told her dismissively that they were just "young" and "immature."

---

[1] The notes from an Amtrak equal employment opportunity investigator's interviews with Klotzbach-Piper are not paginated, contain duplicate pages, and repeat some paragraph numbers across sections. *See generally* Pl.'s Interview Notes. So to point the reader to material within the notes, the Court will first list the date of the relevant interview (because the notes are divided into sections based on date), e.g. "05/17/2016", followed by the applicable paragraph number.

In addition, the Court will consider all the evidence attached to the parties' briefing materials because neither party disputes the admissibility of any of it (with one unsuccessful exception, *see infra* note 2). *See Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 37 (D.C. Cir. 1987) ("[I]t is well established that 'inadmissible documents may be considered by the court if not challenged' . . . ." (quoting 10A Charles Alan Wright, et al., *Federal Practice and Procedure* § 2722, at 60 (2d ed. 1983))).

Pl.'s Interview Notes 01/19/2016 ¶¶ 11, 47; Pl.'s Dep. at 128:3–18.  The mistreatment continued until Shaw voluntarily bid to a new job a few weeks later.  *See* Pl.'s Interview Notes 01/19/2016 ¶ 18; Pl.'s Dep. at 112:7–113:1.  Klotzbach-Piper testified that he told her he left because "[h]e didn't want to deal with working with women anymore."  Pl.'s Dep. at 113:11–12.  Nunziato denied ever receiving complaints about harassment from Klotzbach-Piper.  Mian Decl. ¶ 17.

Klotzbach-Piper had a run-in with Reinert too.  While out to lunch with a group of coworkers, someone mentioned that Reinert was a registered sex offender.  Pl.'s Interview Notes 01/19/2016 ¶ 49.  Klotzbach-Piper responded that he did not "deserve[] to be walking the streets and breathing the same air as I do let alone holding a Management Position in in a Company that cultivates a family atmosphere."  Pl.'s Dep., Ex. 17 ("Boardman Letter"); *see also* Pl.'s Interview Notes 01/19/2016 ¶ 49; Hines Dep., Ex. 5 ("Decision Letter Resp.") at 3, ECF No. 29-6.  She later found out that someone repeated what she said to Reinert.  Pl.'s Interview Notes 01/19/2016 ¶ 49.  After that, she says, her evaluation scores from him declined.  Pl.'s Interview Notes 01/19/2016 ¶ 49; Boardman Letter; Decision Letter Resp. at 3–4.

From May through August 2015, Klotzbach-Piper took several qualifying rides.  *See* Hines Dep., Ex. 4 ("Decision Letter"); *see also* Pl.'s Dep. 97:7–22, 101:16–22; *id.* Ex. 5.  The scores she received from Nunziato and Reinert ranged from middling to failing.  *See* Decision Letter; Pl.'s Dep. at 97:7–22, 101:16–22; *id.* Ex. 5.  Reinert observed that she needed to work on remembering interlocking names and mileposts, that she lacked train handling skills and the ability to multitask, that she violated a speed restriction on one ride, and that she missed a station platform on another.  *See* Decision Letter; Pl.'s Dep. at 97:20–22; *id.* Ex. 5.  Nunziato supervised her final qualifying ride and gave her a failing score.  Nunziato Decl. ¶¶ 9, 11, ECF No. 29-9.  On that ride alone, Klotzbach-Piper missed a station platform twice and violated a speed

restriction.  *Id.* ¶ 10; *see also* Pl.'s Dep. at 157:2–158:13.  Nunziato ended up having Ahmed

operate the train.  Nunziato Decl. ¶ 10; Pl.'s Dep. at 158:8–16.

Two days after that final qualifying ride, Klotzbach-Piper stopped reporting to work.

Def.'s SMF ¶ 96.  She later requested leave under the Family and Medical Leave Act ("FMLA"),

Warner Decl. ¶ 6, ECF No. 29-8, which allows eligible employees to take unpaid leave for

certain family or medical reasons, 29 U.S.C. § 2612(a)(1).  A medical professional had

diagnosed her with anxiety and a mood disorder.  *See* Pl.'s Opp'n Def.'s Mot. Summ. J., Ex. F

("Statement of Disability"), ECF No. 34-9.  Amtrak denied Klotzbach-Piper FMLA leave but

allowed her to take non-FMLA medical leave.  Warner Decl. ¶¶ 7–8.  She was on leave from

August 28 to December 7, 2015.  *Id.* ¶ 8.

After her leave ended, Klotzbach-Piper wrote a letter to Amtrak's CEO, Joseph

Boardman.  *See* Boardman Letter.  She told him that she "suffered daily insults, harassment and

abuse" during her training in Jacksonville.  *Id.*  "Not only was I 'a carpet bagger,'" she wrote,

"but a woman to boot."  *Id.*  She then alleged that Reinert gave her worse evaluation scores after

she commented on his status as a sex offender.  *Id.*  She became "so beaten down" by her

treatment, she said, that she "developed an anxiety disorder" and took leave.  *Id.*  Finally, she

told Boardman that she wanted to return to work but Amtrak had not responded to her inquiries.

*Id.*  She asked him to look into the issue.  *Id.*  On January 11, 2016, Amtrak's Equal Employment

Opportunity Compliance Office responded to her letter and promised to investigate.  Mian Decl.,

Ex. 4.  An investigator interviewed Klotzbach-Piper on January 19.  *See* Pl.'s Interview Notes.

On January 13, however, Klotzbach-Piper received a letter stating that Amtrak was

denying her certification.  *See* Decision Letter.  The author was Jonathan Hines, Amtrak's

System General Road Foreman at the time.  *Id.*  He was based in Wilmington, Delaware.  *Id.*  As

System General Road Foreman, Hines was responsible for overseeing the training and certification programs for locomotive engineers.  Def.'s SMF ¶ 89.  Three system road foremen reported to him.  *Id.* ¶ 90.  Ordinarily, the system road foremen reviewed engineers' evaluations and made certification decisions.  *Id.*  But in Klotzbach-Piper's case, Jacksonville Assistant Superintendent Scott Kenner asked Hines to make the decision himself.  Hines Dep. at 88:18–89:8.[2]  Hines explained in his letter that Klotzbach-Piper "ha[d] not demonstrated the necessary proficiency in the knowledge, skills and abilities required to retain certification . . . based on [her] failure to pass numerous skills performance evaluations."  Decision Letter.  He summarized the poor evaluations from Klotzbach-Piper's qualifying rides, noting that "different Road Foremen" had assessed her performance.  *Id.*  Then, he noted that her instructor evaluations also "showed little to no progress" from September 2014 to July 2015.  *Id.*  The scores she received from instructors connoted "little" or "general familiarity" with the skills and knowledge necessary for certification.  *Id.*  "After reviewing the foregoing evidence as a whole," he concluded, "Amtrak is denying your certification . . . for failure to pass certification rides over the necessary territory."  *Id.*  Klotzbach-Piper responded to Hines's letter to explain that she had been the target of harassment and retaliatory conduct.  *See* Decision Letter Resp.  But after investigating her complaint, Amtrak determined there was not "sufficient evidence" to support her allegation of discrimination.  Pl.'s Opp'n Def.'s Mot. Summ. J., Ex. H., ECF No. 34-11.

---

[2] The one piece of evidence Klotzbach-Piper tries to exclude is Hines's testimony that Kenner asked him to make the certification decision in her case.  Pl.'s Statement Resp. Def.'s SMF ¶ 91, ECF No. 34-2.  She says that Kenner's request is hearsay.  *Id.*  But the rule against hearsay excludes out-of-court statements, not nonassertive questions or commands.  *See* Fed. R. Evid. 801(a); *see also United States v. Long*, 905 F.2d 1572, 1579–80 (D.C. Cir. 1990); *United States v. Moore*, No. 18-cr-198, 2021 WL 1966570, at *5 (D.D.C. May 17, 2021).

Klotzbach-Piper seeks to hold Amtrak liable in federal court.  She brings a variety of discrimination claims under Title VII, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the FMLA.  *See* Compl. ¶¶ 97–152. Previously, the Court dismissed two of Klotzbach-Piper's retaliation claims for failure to exhaust administrative remedies.  *See Klotzbach-Piper v. Nat'l R.R. Passenger Corp.*, 373 F. Supp. 3d 174, 191 (D.D.C. 2019).  Amtrak now moves for summary judgment on the remainder of her claims.  *See* Def.'s Mem. P. & A. Supp. Mot. Summ. J. ("Def.'s Mot."), ECF No. 29-2; *see also* Mem. Law Supp. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 34-1; Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 35.

## III.  LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it could affect the outcome of the litigation, and a dispute is genuine if the evidence would allow a reasonable jury to return a verdict in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant carries the initial burden of pointing to evidence in the record establishing that it meets the standard.  Fed. R. Civ. P. 56(c)(1); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant does that, then the burden shifts to the nonmovant to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  The nonmovant benefits from a judicial assumption that her evidence is credible and that all justifiable inferences should be drawn in her favor.  *Id.* at 255.  Nevertheless, she too must ground her opposition in evidence in the record. Fed. R. Civ. P. 56(c)(1).  Mere allegations cannot demonstrate a genuine issue of material fact. *See Celotex*, 477 U.S. at 324.

## IV.  ANALYSIS

Amtrak requests summary judgment on Klotzbach-Piper's eight remaining claims.  She asserts three classic discrimination claims, arguing that Amtrak refused to certify her as an engineer due to her sex, age, and disability in violation of Title VII, the ADEA, and the ADA. She also brings three retaliation claims.  Her theory for those claims is that Amtrak denied her certification because she exercised rights guaranteed under Title VII, the ADEA, and the FMLA. Lastly, Klotzbach-Piper alleges two hostile work environment claims.  She says that Amtrak subjected her to a hostile work environment based on her sex and age in violation of Title VII and the ADEA.  Before evaluating whether a genuine issue of material fact exists on her claims, however, the Court must determine if a separate federal statute precludes her suit.

Ultimately, the Court determines that Klotzbach-Piper's suit is not precluded.  It then holds that she has not presented enough evidence to avoid summary judgment on most of her claims.  Only her two hostile work environment claims can make it to trial.

### A.  The Railway Labor Act Does Not Preclude Klotzbach-Piper's Claims

Amtrak first argues that the Railway Labor Act ("RLA") precludes Klotzbach-Piper's suit.  *See* Def.'s Mot. at 14–18.  The RLA is meant "to promote stability in labor-management relations" for railroads and airlines "by providing a comprehensive framework for resolving labor disputes."  *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994); *see also* 45 U.S.C. § 151a.  To accomplish that aim, the Act sets up an arbitration scheme to resolve two kinds of disputes: major disputes and minor disputes.  *See Hawaiian Airlines*, 512 U.S. at 252– 53.  Major disputes are those arising from efforts to form or modify a collective bargaining agreement.  *See Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302 (1989).  No one suggests that this lawsuit involves a major dispute.  Minor disputes "grow out of grievances or

out of the interpretation or application of" existing collective bargaining agreements. *Hawaiian Airlines*, 512 U.S. at 252–53 (brackets omitted) (quoting 45 U.S.C. § 151a). Any minor dispute must go through the RLA's arbitration processes. *Id.* at 253. In other words, the RLA precludes courts from hearing federal claims that amount to minor disputes. *See Said v. Nat'l R.R. Passenger Corp.*, 390 F. Supp. 3d 46, 51 n.3 (D.D.C. 2019) ("The RLA 'preempts' state law claims but 'precludes' federal law claims."), *aff'd*, 815 F. App'x 561 (D.C. Cir. 2020).

A claim to enforce a right "independent of" a collective bargaining agreement does not fall under the RLA's preclusive umbrella. *See Hawaiian Airlines*, 512 U.S. at 256; *see also Hamilton v. Nat'l R.R. Passenger Corp.*, No. 19-cv-1986, 2020 WL 6781234, at *4 (D.D.C. Nov. 18, 2020). So the Act usually does not preclude claims based on antidiscrimination laws like the ones that form the basis of Klotzbach-Piper's suit. *See Hawaiian Airlines*, 512 U.S. at 258; *Said*, 390 F. Supp. 3d at 55. The exception is when the claim somehow turns on an interpretation of a collective bargaining agreement. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 832 (7th Cir. 2014); *see also Hamilton*, 2020 WL 6781234, at *4. For example, the RLA precluded a failure-to-accommodate claim when the requested accommodation "might very well [have] violate[d]" a collective bargaining agreement's seniority system. *See Brown v. Ill. Cent. R.R. Co.*, 254 F.3d 654, 661 (7th Cir. 2001). And even if the RLA does not entirely preclude a plaintiff's claim, the Act will still prevent a court from considering any evidence that requires it to interpret or evaluate compliance with a collective bargaining agreement. *See Hamilton*, 2020 WL 6781234, at *5 (reasoning that "[a]ny controversies regarding the interpretation or application of the collective bargaining agreement must be resolved pursuant to the Railway Labor Act" (alteration in original) (quoting *Kemp v. CSX Transp., Inc.*, 993 F. Supp. 2d 197, 216 n.16 (N.D.N.Y. 2014)); *Said*, 390 F. Supp. 3d at 54–55.

9

Amtrak asserts that each of Klotzbach-Piper's claims raise a minor dispute under the RLA. The source of its preclusion argument is the Territorial Qualification Policy, which is part of the collective bargaining agreement between Amtrak and the union that represents engineers. *See* Hines Dep., Ex. 1. The Policy sets out requirements for qualification, including the maximum number of rides a qualifying engineer can take to qualify on a given route. *Id.* For the Jacksonville-Florence route, the maximum is 22 round trips. *Id.* Klotzbach-Piper took more than double that amount before Amtrak decided not to certify her. *See* Decision Letter. But the Policy also states that the trip maximums "do not apply to Student Engineers." Hines Dep., Ex. 1. Klotzbach-Piper argues that she was a student engineer. *See* Pl.'s Statement Resp. Def.'s SMF ("Pl.'s SMF") ¶¶ 71–74, ECF No. 34-2. Amtrak says it treated her as a "reentry engineer" because she had previously been certified. Hines Dep. at 17:1–6, 69:15–19. Klotzbach-Piper retorts that there was no distinction between student engineers and reentry engineers, Pl.'s SMF ¶¶ 27, 46, though she perplexingly cites for support a training agreement between Amtrak and the union that makes exactly that distinction, *see* Pl.'s Opp'n, Ex. E, ECF No. 34-8 (distinguishing between "two[]classes of engine service employees engaged in" Amtrak's engineer training program: "Student Engineers, who have never previously . . . possess[ed] . . . Certification" and "Re-Entry Engineers, who possess . . . Certification or have been deemed to possess acceptable practical experience within the engine service craft").[3]

This classification dispute is what Amtrak argues bars judicial consideration of Klotzbach-Piper's suit. According to Amtrak, assessing her claims would require the Court to evaluate whether the company's reason for not certifying her was genuine or pretextual. Def.'s

---

[3] Amtrak attaches to its reply a newer version of the agreement that became effective June 1, 2015—before Hines made the decision not to certify Klotzbach-Piper. *See* Def.'s Reply, Ex. A. It too distinguishes between student and reentry engineers. *See id.*

Mot. at 17.  That inquiry, Amtrak continues, would entail determining whether the company followed the training regimen the Territorial Qualification Policy prescribes.  *Id.*  The Court would have to interpret and apply the Policy to answer questions like "whether [Klotzbach-Piper] was provided the appropriate number of training rides, whether she was properly categorized as a reentry engineer, [and] who are held to a higher standard, [a reentry engineer] or a student engineer."  *Id.*

Amtrak cannot invoke the RLA to sweep Klotzbach-Piper's claims out of court.  Her suit is based on federal antidiscrimination laws that confer on her rights "independent of" any collective bargaining agreement.  *See Hamilton*, 2020 WL 6781234, at *4 ("The FMLA claims that Hamilton asserts here arise independent of the [collective bargaining agreement].");  *Said*, 390 F. Supp. 3d at 55 ("[T]he plaintiff's claims seek 'to enforce rights that are independent of the [collective bargaining agreement],' namely, the right not to be discriminated against by an employer as prescribed by federal and state laws." (citation omitted)).  And her claims tee up "purely factual questions" about each parties' conduct and Amtrak's motives that "do not 'requir[e] a court to interpret any term of a collective-bargaining agreement.'"  *See Hawaiian Airlines*, 512 U.S. at 261 (alteration in original) (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988)).

But to the limited extent either party points to evidence that requires interpreting the Territorial Qualification Policy, the Court will not consider it.  That includes the evidence that Klotzbach-Piper took more than twice the number of trips on the Jacksonville-Florence route than the Policy allowed.  To ascribe significance to that discrepancy, the Court would have to determine whether the Policy's maximum ride provision applied to her.  The RLA also precludes the consideration of evidence that Klotzbach-Piper received six weeks of classroom training

while student engineers in her training class received eight weeks.  *See* Def.'s SMF ¶¶ 24–27;
Pl.'s SMF ¶¶ 24–27.  Klotzbach-Piper says that she was entitled to eight weeks of classroom
training because she was a student engineer.  Pl.'s SMF ¶¶ 24, 26.  She insinuates that she
received only six weeks due to discrimination.  *See id.*  Amtrak responds that it provides reentry
engineers with just six weeks of classroom training as a matter of course, presumably because
they already received training when they first certified.  *See* Def.'s SMF ¶ 25.  Given the parties'
disagreement over what the collective bargaining agreement requires, the Court will not consider
the inferences a jury could draw from the fact that Klotzbach-Piper received two fewer weeks of
classroom training than the student engineers in her training class.

Those pieces of evidence aside, there is no dispute that the substance of the training and
the requirements for certification are the same for each class of engineer.  *See* Hines Dep. at
17:7–16.  *Compare* Def.'s SMF ¶¶ 25, 32, *with* Pl.'s SMF ¶¶ 25, 32.  The RLA does not preclude
claims alleging the discriminatory enforcement of a collective bargaining agreement's term
whose meaning is undisputed.  *See Carlson*, 758 F.3d at 833; *Carmona v. Sw. Airlines Co.*, 536
F.3d 344, 349–50 (5th Cir. 2008).  Consequently, the Court will still consider evidence showing
whether Amtrak treated Klotzbach-Piper differently than other engineer trainees when it came to
the content of instruction or evaluating whether she met the requirements for certification.  The
Court now assesses whether there is a genuine dispute of material fact on her claims.

### B.  Klotzbach-Piper's Discrimination Claims

In Klotzbach-Piper's first set of claims, she alleges that Amtrak discriminated against her
on account of her sex, age, and disability when it denied her certification.  Compl. ¶¶ 110–19,
142–47.  Although those kinds of discrimination violate different statutes—Title VII, the ADEA,
and the ADA, respectively—the same burden-shifting framework for assessing discrimination

applies to each claim.  *See Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015) (Title VII);

*Paquin v. Fed. Nat. Mortg. Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997) (ADEA); *Giles v. Transit*

*Emps. Fed. Credit Union*, 794 F.3d 1, 5 (D.C. Cir. 2015) (ADA).  And when an employer

supplies a legitimate reason for taking a challenged employment action, the framework collapses

into one ultimate question: Has the plaintiff produced enough evidence for a reasonable jury to

conclude that the employer's asserted reason is false and that the employer instead discriminated

against her based on a protected characteristic?  *See Wheeler v. Georgetown Univ. Hosp.*, 812

F.3d 1109, 1114 (D.C. Cir. 2016).  The plaintiff makes that showing by pointing to:

> the employer's better treatment of similarly situated employees outside the
> plaintiff's protected group, its inconsistent or dishonest explanations, its deviation
> from established procedures or criteria, [its] pattern of poor treatment of other
> employees in the same protected group as the plaintiff, or other relevant evidence
> that a jury could reasonably conclude evinces an illicit motive.

*Walker*, 798 F.3d at 1092.

Amtrak asserts that it refused to recertify Klotzbach-Piper because she failed to qualify

on the Jacksonville-Florence route.  *See* Def.'s Mot. at 21.  It explains that it cannot qualify an

engineer who fails to demonstrate that she has the skills to operate a train safely or who falls

short of memorizing the physical characteristics and speed restrictions along her route.  *Id.*

Klotzbach-Piper could do neither, Amtrak says.  As the company recounts, multiple reviewers

who assessed her performance gave her "middling to failing scores" that "deteriorated over

time."  *Id.*; *see also* Def.'s SMF ¶¶ 47–54, 64–70, 87, 93.  The reviewers observed that

Klotzbach-Piper forgot features of her route like braking points and speed restrictions.  Def.'s

SMF ¶¶ 51–54, 65–68, 79–83.  On her final qualification ride alone, Klotzbach-Piper missed a

station platform twice and violated a speed restriction while crossing a bridge.  *Id.* ¶¶ 79–84.

Klotzbach-Piper does not dispute most of these facts.  Indeed, she admits some of them expressly in response to Amtrak's statement of undisputed material facts.  *See, e.g.*, Pl.'s SMF 64–67, 79–81.  And while she expresses disagreement with other facts described in Amtrak's statement, she does not support her positions with citations to the record.  *See, e.g., id.* ¶¶ 47–54, 69–70, 82–87 (omitting citation to the record).  The Court thus treats the facts in the latter category as admitted too.  *See* D.D.C. Local Civ. R. 7(h)(1); *Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 154 (D.C. Cir. 1996).  In any case, uncontroverted record evidence confirms that Klotzbach-Piper received mediocre evaluations from several different reviewers and made numerous mistakes while training on her route.  *See, e.g.*, Pl.'s Dep. at 75:4–22, 157:5–11; *id.* Exs. 1–3, 5–11 (copies of evaluations).

Though Klotzbach-Piper acknowledges that she received low scores and made mistakes during training, she argues that the scores and mistakes were not representative of her skills and came about because of discrimination.  She points out that "the record is missing a significant amount of [her] evaluations" and suggests that Amtrak withheld or destroyed evaluations out of a discriminatory motive.  *See* Pl.'s Opp'n at 5.  The adverse inference she requests is appropriate "whenever a preponderance of the evidence establishes that a party's misconduct has tainted the evidentiary resolution of the issue." *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) (quoting *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1478 (D.C. Cir. 1995)); *see also Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 27 (D.C. Cir. 2013) (explaining that a factfinder can draw a negative inference against a party that destroys relevant evidence it was supposed to maintain); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW) v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972) ("[The adverse inference] rule provides that when a party has relevant evidence within his control which he fails

14

to produce, that failure gives rise to an inference that the evidence is unfavorable to him.").

Before a party is entitled to the benefit of an adverse inference, however, she must establish that

relevant evidence existed and that the opposing party improperly failed to produce or preserve

the evidence even though it should have. *See Zhi Chen*, 839 F. Supp. 2d at 13; *Friends For All*

*Child., Inc. v. Lockheed Aircraft Corp.*, 587 F. Supp. 180, 189 (D.D.C. 1984).

Klotzbach-Piper has not done that.  To be fair, it appears that additional evaluations

existed beyond those attached to Amtrak's briefs.  The number of evaluations Amtrak introduced

(by the Court's count, 44, *see* Pl.'s Dep, Exs. 1–3, 5–11) is less than the number of trips

Klotzbach-Piper took along the Jacksonville-Florence route (over 53, Def.'s SMF ¶ 71).  And

none of those evaluations list Shaw as the evaluator even though he likely completed some for

her.  *See* Pl.'s Dep., Exs. 1–3, 5–11.  Trainers like him were supposed to, Hines Dep. at 112:3–

11, and deposition testimony indicates that he evaluated her, *see* Pl.'s Dep. at 52:7–19;

Williamson Dep. at 61:18–62:3, ECF No. 34-6.  In addition, Hines said in his letter denying

Klotzbach-Piper certification that she had done poorly on four qualifying rides from May 1 to

August 26, 2015.  *See* Decision Letter.  But only one of the four road foremen evaluations

Amtrak attached to its motion fell within that date range.  *See* Pl.'s Dep., Ex. 5.

Nevertheless, Klotzbach-Piper utterly fails to substantiate her suggestion that Amtrak

wrongly destroyed evaluations or kept some from her during discovery.  *See* Pl.'s Opp'n at 5.

Without any context from Klotzbach-Piper, the Court does not know if she ever sought the

missing evaluations in discovery or what reason Amtrak provided for not turning them over if

she did.  It could be that Klotzbach-Piper never asked for the missing evaluations.  *See Figueroa*

*v. Pompeo*, 923 F.3d 1078, 1094 (D.C. Cir. 2019) ("Discovery blunders may prevent a plaintiff

from succeeding at [demonstrating pretext].").  It could also be that Amtrak did not hide any

evaluations but simply introduced only a sampling of evaluations from trainers other than Shaw to show that even evaluators for whom there are no claims of bias gave Klotzbach-Piper poor reviews.  *See Huthnance v. District of Columbia*, 722 F.3d 371, 378 (D.C. Cir. 2013) (explaining that the "missing evidence rule" does not apply "when there are innocuous explanations for the party's failure to introduce the evidence").  Because Klotzbach-Piper has provided no justification for her adverse inference request, she is not entitled to one.  *Cf. Figueroa v. Tillerson*, 289 F. Supp. 3d 212, 226 (D.D.C. 2018) (rejecting employee's request for adverse inference because he "point[ed] to no evidence" that allegedly destroyed notes "ever existed"), *rev'd on other grounds*, 923 F.3d 1078.

Aside from pointing to missing evaluations, Klotzbach-Piper tries to establish pretext by highlighting the mistreatment she suffered and how she received different training than similarly situated trainees who were younger and male.  *See* Pl.'s Opp'n at 5–8.  Her briefing leaves much to be desired, but there is a good deal of evidence that one of her trainers, Shaw, and his friend, Martone, treated her unfairly based on her age and sex.  According to Klotzbach-Piper, Shaw and Martone kicked her while she was operating the train, hit her chair with a flagging stick, brushed against her breasts, and called her a "grandmother."  Def.'s SMF ¶ 119; *see also* Pl.'s Interview Notes 01/19/2016 ¶¶ 8–9.  They often complained about having to train her.  Williamson Dep. at 37:12–18.  Indeed, when Shaw changed jobs, Klotzbach-Piper claims that he told her that he was sick of working with women.  Pl.'s Dep. at 113:5–12.  Shaw and Martone frequently joked that Klotzbach-Piper and a female conductor, Helen Williamson, "were part of the Alzheimer's club."  Williamson Dep. at 56:4–6, 62:15–17; *see also* Pl.'s Interview Notes 01/19/2016 ¶ 17.  Martone derogatorily commented on Klotzbach-Piper's memory in other ways too, making remarks such as, "She can't remember shit," and "It's like Groundhog Day over and over and

over again." Williamson Dep. at 50:15–20; *see also* Pl.'s Interview Notes 01/19/2016 ¶ 8.  In

one instance, Martone gave insulting Christmas cards to Klotzbach-Piper and Williamson but not

to any men.  Williamson Dep. at 62:18–64:1.  Shaw also made "inappropriate" comments to

Klotzbach-Piper.  Pl.'s Dep. at 54:16–21.  He referred to her as a "bitch" or a "fucking bitch" on

"many occasions," Pl.'s Interview Notes 01/19/2016 ¶ 14, including once immediately after

discussing an evaluation with her, Williamson Dep. at 61:21–62:10; Pl.'s Dep. at 113:20–22.

There is less evidence indicating how Shaw and Martone's treatment of Klotzbach-Piper

differed from their treatment of younger, male trainees, but what evidence there is suggests that

they treated her worse.  Williamson testified that Shaw and Martone were "not disrespectful"

when dealing with male trainees.  Williamson Dep. at 56:1–8.  Williamson also said that they

were more patient with male engineers.  She recalled a time when Klotzbach-Piper overran a

station platform and Shaw and Martone "treated her [as] you would have thought that it was the

end of the world." *Id.* at 55:7–19; *see also* Pl.'s Interview Notes 01/19/2016 ¶ 60.  By contrast,

she explained, it "was no big deal" when male engineers made the same mistake.  Williamson

Dep. at 55:15–19; *see also* Pl.'s Interview Notes 01/19/2016 ¶ 60.  A jury reviewing all this

evidence could certainly conclude that Shaw and Martone harbored animus against Klotzbach-

Piper due to her sex and/or age.

Ultimately, however, Klotzbach-Piper's discrimination claims challenge not Shaw and

Martone's actions but Amtrak's refusal to certify her.  So for her claims to succeed, she must

show that the person who made that decision for Amtrak, System General Road Foreman Hines,

either acted discriminatorily himself or was "an unwitting . . . agent" of his subordinates'

animus.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 297 (D.C. Cir. 2015).

Klotzbach-Piper pursues the first path for her disability discrimination claim and the second path

for her sex and age discrimination claims.  *See* Pl.'s Opp'n at 3–5.  Both paths are dead-ends.

### 1.  The Disability Discrimination Claim

Amtrak is entitled to summary judgment on Klotzbach-Piper's disability discrimination

claim because she provides no evidentiary support for it.  Even assuming that her diagnoses of

anxiety and mood disorder qualify as disabilities under the ADA,[4] she has not cited any evidence

that Hines knew about the conditions when he decided not to certify her.  An employer cannot

discriminate against an employee based on a disability if it is not aware of the disability.  *See*

*Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 337 (D.D.C. 2018), *aff'd*, 815 F. App'x

561; *see also Crandall v. Paralyzed Veterans of Am.*, 146 F.3d 894, 897 (D.C. Cir. 1998)

(explaining that, under the ADA and Rehabilitation Act, "the employer must have acted with an

awareness of the disability itself, and not merely an awareness of some deficiency in the

employee's performance that might be a product of an unknown disability").  Yet all Klotzbach-

Piper says to establish Hines's awareness of her disabilities is that he should have known about

them because she took medical leave before he made the decision not to certify her.  *See* Pl.'s

Opp'n at 4; *see also* Def.'s SMF ¶¶ 92, 98.

But Hines testified that he did not know about her disabilities.  He said that local

management—in Klotzbach-Piper's case, her supervisor, Nunziato—handled requests for FMLA

and medical leave, not him.  Hines Dep. at 97:1–18.  Klotzbach-Piper offers no evidence to

---

[4] Klotzbach-Piper has done little to show that her anxiety and mood disorder qualify as disabilities besides attach FMLA paperwork to her opposition.  *See* Statement of Disability; *see also Haynes v. Williams*, 392 F.3d 478, 482 (D.C. Cir. 2004) ("It is the plaintiff's burden to prove that he is disabled."); *Thompson v. Rice*, 422 F. Supp. 2d 158, 170 (D.D.C. 2006) ("Merely submitting a medical diagnosis of an impairment is insufficient to establish disability status."), *aff'd*, 305 F. App'x 665 (D.C. Cir. 2008).

refute that testimony.  On the contrary, the paperwork she completed to request FMLA leave asked her to identify her supervisor, corroborating Hines's testimony that Nunziato was the one who acted on medical-related leave requests.  *See* Warner Decl., Ex. 2; Statement of Disability. Klotzbach-Piper cannot fend off summary judgment by resorting to "mere speculation" about what Hines should have known.  *See Ellis v. Georgetown Univ. Hosp.*, 723 F. Supp. 2d 42, 47 (D.D.C. 2010) ("[T]he nonmoving party cannot rely on mere speculation or compilation of inferences to defeat a motion for summary judgment.").  Because she provides no evidence indicating that Hines knew about her disabilities when he declined to certify her, Amtrak deserves summary judgment on her disability discrimination claim.  *Cf. Said*, 317 F. Supp. 3d at 338 ("[E]ven assuming that the defendant knew that the plaintiff had not reported to work because she was 'ill' and collecting 'sickness benefit[s]' from the Board, such knowledge is not sufficient to demonstrate that the defendant was 'on notice of the existence and nature of [her] disability.'" (second and third alterations in original) (citation omitted)).

### 2.  The Sex and Age Discrimination Claims

With respect to her sex and age discrimination claims, Klotzbach-Piper asserts that Hines "relied on the reports" of her "harassers" when deciding not to certify her.  Pl.'s Opp'n at 8. Seeing as there is no evidence that Martone ever evaluated Klotzbach-Piper, she apparently refers to Shaw.  Under a "cat's paw" theory, "the discriminatory animus of a subordinate who recommends an adverse employment decision is imputed to the selecting officer who relies on the subordinate's recommendation."  *Brandli v. Micrus Endovascular Corp.*, 209 F. Supp. 3d 356, 361 (D.D.C. 2016) (quoting *McNally v. Norton*, 498 F. Supp. 2d 167, 184 n.16 (D.D.C. 2007), *aff'd*, 709 F. App'x 7 (D.C. Cir. 2017)).  A plaintiff asserting a cat's paw theory must show (1) that the decisionmaker's subordinate performed an act motivated by discriminatory

animus, (2) that the subordinate intended to cause an adverse employment action, and (3) that the subordinate's act was a cause of the ultimate employment action. *See Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016); *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011).

Exactly how close a causal connection must be to satisfy the third element depends on the cause of action. The ADEA, which prohibits an employer from taking an adverse action "because of" an employee's age, requires a plaintiff to show that her age was a but-for cause of her injury. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–77 (2009); *see also Sims v. MVM, Inc.*, 704 F.3d 1327, 1335–37 (11th Cir. 2013) (holding that the ADEA required a cat's paw plaintiff to demonstrate but-for causation). Something is a but-for cause if it "had a determinative influence on" or was "a necessary logical condition" of the outcome. *Gross*, 557 U.S. at 176 (emphasis omitted) (first quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993); and then quoting *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 (2007)).

Title VII sets a lower bar by making it unlawful for an employee's sex to be a "motivating factor" in an employer's adverse action, so a Title VII plaintiff usually must prove only proximate causation. *See Burley*, 801 F.3d at 297 & n.1 (requiring proximate cause in Title VII cat's paw context). Proximate causation means that there is "some direct relation between the injury asserted and the injurious conduct alleged"; it "excludes only those links that are too remote, purely contingent, or indirect." *Staub*, 562 U.S. at 419 (brackets omitted) (quoting *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010)). Another cause can supersede a proximate cause "if it is a 'cause of independent origin that was not foreseeable.'" *Id.* at 420 (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)).[5]

---

[5] Which causation standard governs ADA claims—but-for or proximate causation— "remains an open question in this circuit." *Haughton v. District of Columbia*, 819 F. App'x 1, 2 (D.C. Cir. 2020). *Compare Conn v. Am. Nat'l Red Cross*, 149 F. Supp. 3d 136, 142 (D.D.C.

Adding to the complexity is a quirk of Title VII.  Although a plaintiff can technically prevail on a Title VII claim by proving that discrimination was a motivating factor behind an adverse employment action, she can recover monetary relief only if she also proves that discrimination was a but-for cause of the action.  *See* 42 U.S.C. § 2000e-5(g)(2)(B); *Nuskey v. Hochberg*, 730 F. Supp. 2d 1, 3 n.1 (D.D.C. 2010) (explaining that, when an employer would have taken the same action absent a discriminatory motive, "the plaintiff is entitled only to declaratory relief, limited injunctive relief, and attorneys' fees—but not to compensatory damages, reinstatement, or back pay"); *see also Mayorga v. Merdon*, 928 F.3d 84, 89 (D.C. Cir. 2019); *Ponce v. Billington*, 679 F.3d 840, 844–45 (D.C. Cir. 2012).  These "alternative ways of establishing liability" are called the "mixed-motive" theory and the "but-for" theory (or, less accurately, the "single-motive" theory).  *See Mayorga*, 928 F.3d at 89 (quoting *Ponce*, 679 F.3d at 845).  A plaintiff can pursue both theories of liability "simultaneously."  *Ponce*, 679 F.3d at 845.  But "at some point," the plaintiff "must place the employer and court on notice as to the theory or theories under which he intends to proceed."  *Id.*; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12 (1989) (plurality).  A plaintiff who raises just a but-for theory cannot survive summary judgment by providing evidence that establishes only mixed-motive liability.  *See, e.g.*, *Mayorga*, 928 F.3d at 95; *Ginger v. District of Columbia*, 527 F.3d 1340, 1345–46 (D.C. Cir. 2008).

It appears that Klotzbach-Piper asserts solely a but-for theory of liability.  She requests only monetary relief.  *See* Compl. at 25–26 (requesting lost income and damages but not declaratory or injunctive relief).  And her argument leaves little room for Amtrak harboring

---

2016) (holding that the but-for standard applies and collecting court of appeals cases), *with Drasek v. Burwell*, 121 F. Supp. 3d 143, 154 (D.D.C. 2015) ("[A] discrimination or retaliation claim brought under the ADA can rest on a 'motivating factor' causation analysis . . . .").

mixed motives.  *See* Pl.'s Opp'n at 4 ("Amtrak did not have a legitimate reason to not certify

Plaintiff as a Locomotive Engineer.").  As a result, it could be that Title VII requires her to

establish but-for rather than proximate causation to prove cat's paw sex discrimination.  *See*

*Haughton v. District of Columbia*, 819 F. App'x 1, 3 (D.C. Cir. 2020) (rejecting argument that

the district court erred by giving but-for causation jury instruction because, based on the record,

there was "no question" that the plaintiff "advanced only a single-motive theory").

But the D.C. Circuit has not addressed how a Title VII plaintiff's requested relief might

affect the cat's paw analysis.  On the one hand, it has applied the lower proximate causation

standard in Title VII cat's paw cases even when the plaintiff requested monetary relief.  *See, e.g.*,

*Burley*, 801 F.3d at 320 & n.1 (using proximate cause standard when a Title VII plaintiff sought,

"among other relief, two years' worth of back pay," *id.* at 318).  On the other hand, the Circuit

has never discussed what a plaintiff alleging cat's paw liability would have to prove at trial to

win monetary relief.  It has instead likened—without much analysis—Title VII's baseline

motivating factor standard to another statute with similar wording that the Supreme Court has

interpreted to require a showing of proximate causation for cat's paw liability.  *See id.* (citing

*Staub*, 562 U.S. at 422).  *But see Gross*, 557 U.S. at 174 ("When conducting statutory

interpretation, we 'must be careful not to apply rules applicable under one statute to a different

statute without careful and critical examination.'" (quoting *Fed. Express Corp. v. Holowecki*,

552 U.S. 389, 393 (2008))).  Perhaps no party has raised the issue.  Or perhaps plaintiffs in

earlier cases pursued both mixed-motive and but-for theories of liability.  Based on cases

granting summary judgment against Title VII plaintiffs seeking monetary relief for failing to

show but-for causation, however, this Court suspects that Klotzbach-Piper must likewise

establish but-for causation for her cat's paw sex discrimination claim to survive summary judgment.  *See Mayorga*, 928 F.3d at 95; *Ginger*, 527 F.3d at 1345–46.

In any event, the Court does not need to answer the question to resolve Amtrak's motion. Even if Klotzbach-Piper can show that Shaw discriminatorily evaluated her so that Amtrak would not certify her, she cannot demonstrate that his actions were either a but-for or proximate cause of Hines's decision.  That is not to say that Hines did not consider Shaw's evaluations (contrary to Amtrak's suggestion, *see* Def.'s Reply at 17–18).  Hines testified that he reviewed "all" of Klotzbach-Piper's evaluations, including both those that training instructors like Shaw would have filled out and those that the road foremen used to assess readiness for qualification. Hines Dep. at 112:7–15.

But Shaw's evaluations were not "a necessary logical condition" of Hines's decision not to certify Klotzbach-Piper, nor were they related so directly to the decision to be considered a "motivating factor" behind it.  As Hines wrote in his decision letter, evaluations from different instructors and road foreman consistently gave Klotzbach-Piper middling proficiency scores. *See* Decision Letter.  Morrison, whom Klotzbach-Piper called "a pretty good instructor," Pl.'s Dep. at 56:20–21, gave her scores that denoted "little" or "general familiarity" with the route (scores of around 2 or 3 on a scale of 1 to 5), *id.* Exs. 6–11.  Indeed, Morrison remarked as late as June 2015 that Klotzbach-Piper "still need[ed] to learn breaking p[oin]ts for station and control p[oin]ts" and that she "need[ed] more trips."  Pl.'s Dep., Ex. 11 (capitalization altered). Ahmed gave her similar scores around the same time and commented that Klotzbach-Piper had "difficulty multi tasking," "remebering [sic] where track speeds start," and "remebering [sic] station locations."  *Id.* (capitalization altered).  And when Reinert and Nunziato evaluated Klotzbach-Piper for qualification in May through August of 2015, they recorded that she needed

to improve her train handling, that she had difficulty multi-tasking, and that she committed mistakes like missing stations or violating speed restrictions.  *See* Decision Letter; *see also* Pl.'s Dep., Ex. 5.  The issues were so serious that both Reinert and Nunziato flunked Klotzbach-Piper on her "skills performance qualification."  Decision Letter; *see also* Pl.'s Dep., Ex. 5.[6]

The evidence makes the but-for causation question is an easy one.  Given that Klotzbach-Piper received consistently poor reviews from evaluators whom she does not allege harbored sex- or age-related animus, a jury could not reasonably conclude that any evaluations from Shaw had "a determinative influence on" Hines's decision not to certify her.  Said differently: take away Shaw's evaluations and the reasons Hines cited in his decision letter—failing qualification rides and mediocre instructor evaluations—remain.  Klotzbach-Piper could not convince a reasonable jury that Shaw's evaluations were a but-for cause of Hines's refusal to certify her.

The lower proximate causation bar presents a closer question, but Klotzbach-Piper cannot raise a triable issue under it either.  "[E]ven under a proximate cause analysis, causation can be cut off" when "the causal link between conduct and result is so attenuated that the consequence

---

[6] Klotzbach-Piper asserts that Reinert gave her mediocre evaluation scores because she disparaged him for being a sex offender.  *See* Pl.'s Opp'n at 5.  Even assuming that is true, Title VII and the ADEA prohibit unfair treatment only if it is based on a protected characteristic like sex or age.  *See Burford v. Yellen*, 246 F. Supp. 3d 161, 175 (D.D.C. 2017) ("To prove a claim of disparate treatment, a plaintiff must first show that she suffered an adverse employment action; and, as relevant here, *that the adverse employment action was based on her sex or age*." (emphasis added)).  Reinert's alleged retaliation against Klotzbach-Piper for insulting him does not fit the bill.  *Cf. Kilby-Robb v. Devos*, 246 F. Supp. 3d 182, 198 (D.D.C. 2017) (rejecting the argument that a supervisor hiring a family member showed pretext because "favoritism based on criteria other than race, color, age, or other protected characteristics does not violate the federal anti-discrimination laws and does not raise an inference of discrimination" (cleaned up) (citation omitted)); *cf. also Barot v. Embassy of Republic of Zambia*, 299 F. Supp. 3d 160, 188 n.22 (D.D.C. 2018) (rejecting the argument that sending a letter constituted "protected activity" giving rise to a retaliation claim because "the 'discrimination' complained of in the letter d[id] not refer to any protected characteristic under Title VII, but rather focuse[d] on plaintiff's belief that she was being treated unfairly in comparison to other employees who ha[d] been subject to discipline"), *aff'd*, 773 F. App'x 6 (D.C. Cir. 2019).

is more aptly described as mere fortuity." *Duncan v. Johnson*, 213 F. Supp. 3d 161, 194 (D.D.C. 2016) (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)); *see also Hampton v. Vilsack*, 685 F.3d 1096, 1102 (D.C. Cir. 2012) ("[W]hen the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and a legally permissible basis, the bias of the subordinate is not relevant." (alteration in original) (citation omitted)).  Recall that Shaw stopped training Klotzbach-Piper—and Ahmed replaced him as one of her instructors—in February 2015. Pl.'s Dep. at 112:5–113:1.  Yet despite several months of unbiased trainers at the tail end of her training, Klotzbach-Piper's instructor evaluations "showed little to no progress" from when she began training in September 2014 through July 2015.  *See* Decision Letter.  Indeed, unbiased evaluators not only continued to give Klotzbach-Piper mediocre and failing evaluations in the final months of her training (when one would expect her to be most proficient) but also documented mistakes like missing stations or speed restrictions.  *See* Pl.'s Dep., Exs. 5, 8–11. Hines reviewed the evaluations and determined that Klotzbach-Piper lacked the "knowledge, train handling and multitasking skills necessary" to be certified as an engineer.  Decision Letter.

The string of poor reports from unbiased evaluators following Shaw's departure and Hines's independent assessment of Klotzbach-Piper's performance makes any connection between Shaw's animus and the noncertification decision too attenuated to constitute proximate cause.  *Compare Hampton*, 685 F.3d at 477–78 (affirming grant of summary judgment to an employer because the decisionmaker was not "dependent upon a biased subordinate's opinion" but instead "made an independent assessment of [the employee's] conduct and concluded that [his] violations of multiple [agency] employment policies warranted his termination" (brackets omitted) (citations omitted)), *with Gibbs v. Wash. Metro. Area Transit Auth.*, 48 F. Supp. 3d 110,

130 (D.D.C. 2014) (finding that plaintiff had shown proximate cause when an investigative "panel did not develop an *alternative* reason for terminating" the plaintiffs other than a supervisor's tainted recommendation).   Hines may have reviewed evaluations from Shaw, but it would be unreasonable to say that Shaw's input *motivated* Hines's decision not to certify her. *Cf. Staub*, 562 U.S. at 418–19 ("When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a 'factor' or a 'causal factor' in the decision; but it seems to us a considerable stretch to call it 'a motivating factor.'" (dicta)).   The relationship between Shaw's alleged prejudice and Hines's decision was coincidental, not causal.

Because Klotzbach-Piper could not convince a reasonable jury that Shaw's actions were a proximate cause of Amtrak's refusal to certify her, much less a but-for cause, Amtrak is entitled to summary judgment on her sex and age discrimination claims.   None of her discrimination claims survive summary judgment.

## C.  Klotzbach-Piper's Retaliation Claims

Next up are Klotzbach-Piper's retaliation claims.   Following the Court's decision on Amtrak's motion to dismiss, three retaliation claims remain.  *See Klotzbach-Piper*, 373 F. Supp. 3d at 187 (dismissing two retaliation claims for failure to exhaust).   One alleges that Amtrak violated the FMLA because it refused to certify Klotzbach-Piper after she took medical leave. Compl. ¶¶ 148–52.   The other two charge Amtrak with violating Title VII and the ADEA by not certifying her in retaliation for her complaining about the sex- and age-based harassment she experienced.  *See id.* ¶¶ 120–24, 131–35.   None of these claims withstand summary judgment.

1. FMLA Retaliation

Klotzbach-Piper's FMLA claim suffers from two fatal flaws.  First, she did not qualify for FMLA leave when she applied for it.  "[C]ourts have generally recognized that, aside from very limited circumstances, eligibility under the FMLA is a prerequisite to make an FMLA retaliation claim." *Dougherty v. Cable News Network*, 396 F. Supp. 3d 84, 112 (D.D.C. 2019) (collecting cases from the Fifth, Eighth, and Eleventh Circuits); *see also* 29 U.S.C. § 2617(a)(1) (providing that employers who discriminate based on FMLA-protected practices "shall be liable to any *eligible employee affected*" (emphasis added)).  An employee is eligible for FMLA leave if she has worked for an employer for at least 12 months and for at least 1,250 hours during the previous 12-month period.  29 U.S.C. § 2611(2)(A).  But when Klotzbach-Piper applied for FMLA leave, she had worked only 1,055.73 hours in the prior 12 months.  Warner Decl. ¶ 7; *id.* Ex. 3.  And she applied for FMLA leave after she stopped working, *id.* ¶ 6, so she did not fall into the exception at least one court has recognized for an employee who was not eligible at the time she applied for leave but would be eligible by the time the proposed leave would start.  *See Dougherty*, 396 F. Supp. 3d at 112 n.12 (citing *Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1272–73 (11th Cir. 2012)).

Second, Klotzbach-Piper offers no evidence to suggest that Amtrak did not certify her because she requested FMLA leave.  A key element for an FMLA retaliation claim is that there was a causal connection between a plaintiff's exercise of FMLA rights and her suffering an adverse action.  *See Gordon v. U.S. Capitol Police*, 778 F.3d 158, 161 (D.C. Cir. 2015).  Yet Klotzbach-Piper's six-sentence argument for her claim barely touches on causation, much less cites evidence to back it up.  The only conceivable support for a causal connection between Klotzbach-Piper's request for leave and the noncertification is the temporal proximity between

27

the two.  *See* Pl.'s Opp'n at 11 ("Plaintiff requested FMLA, was denied, and was then

terminated.").  She stopped going to work on August 28, 2015, Warner Decl. ¶ 6, retroactively

applied for FMLA leave on September 11, 2015, *id.* Ex. 2, and was denied certification on

January 13, 2016, Decision Letter.  But when a plaintiff's causation argument is "premised on

temporal proximity alone," a three- or four-month delay "between the protected activity and the

adverse employment action is too great to establish an inference of causation."  *Davis v. George

Wash. Univ.*, 26 F. Supp. 3d 103, 130 (D.D.C. 2014) (collecting cases).  And regardless, an

FMLA retaliation plaintiff confronted with an employer's legitimate reason for taking an adverse

employment action must present "positive evidence beyond mere proximity" to raise a genuine

issue as to the employer's motive.  *See Waggel v. George Wash. Univ.*, 957 F.3d 1364, 1376

(D.C. Cir. 2020) (quoting *Minter v. District of Columbia*, 809 F.3d 66, 71–72 (D.C. Cir. 2015)).

Klotzbach-Piper has thus failed to raise a triable issue on her FMLA retaliation claim.

### 2.  Title VII and ADEA Retaliation

Klotzbach-Piper's Title VII and ADEA retaliation claims cannot survive summary

judgment either.  She asserts that Amtrak refused to certify her as a result of "several

complaints" that she made "to her union and to management throughout the entire time that she

was being harassed" as well as the letter that she sent to Amtrak's CEO.  Pl.'s Opp'n at 10.

Amtrak again responds that it did not certify her because Hines determined she lacked the skills

to safely operate a locomotive along the Jacksonville-Florence route.  *See* Def.'s Mot. at 32–33.

As with discrimination claims, an employer's proffer of a legitimate reason for acting against an

employee reduces the burden-shifting framework that governs retaliation claims to "the ultimate

issue of retaliation *vel non*."  *Durant v. D.C. Gov't*, 875 F.3d 685, 699 (D.C. Cir. 2017) (quoting

*Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009)).  Klotzbach-Piper must therefore show

that "'the legitimate reasons offered by the defendant were not its true reasons[] but were a pretext' for retaliation." *Id.* (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).  She has fallen short of raising a genuine dispute on that issue.

To begin, there is no evidence that Hines knew about Klotzbach-Piper's complaints of sex and age discrimination.  An employee cannot show unlawful retaliation unless she can establish that the decisionmaker knew about her protected activity.  *See Morris*, 825 F.3d at 674.  To establish Hines's awareness of her complaints, Klotzbach-Piper merely points to the fact that she made the complaints and says, "[u]pon information and belief, Mr. Hines was aware of these facts when he made the decision."  Pl.'s Opp'n at 10.  Such "information and belief" allegations, which Klotzbach-Piper does not even make in an affidavit, are "unacceptable" when opposing summary judgment.  *See Londrigan v. FBI*, 670 F.2d 1164, 1174 (D.C. Cir. 1981); *see also Jud. Watch, Inc. v. U.S. Dep't of Com.*, 224 F.R.D. 261, 265 (D.D.C. 2004) ("Rule 56(e)'s personal knowledge requirement[] renders statements made on information and belief, facts which the affiant believes but does not know are true, insufficient.").

An independent search of the parties' exhibits uncovers little actual evidence of Hines's awareness.  Klotzbach-Piper appears to have lodged three complaints of sex- or age-based harassment before Hines's noncertification decision.  *Cf. Townsend v. United States*, 236 F. Supp. 3d 280, 317 (D.D.C. 2017) (reasoning that there was no causal relationship between a plaintiff's termination and complaints he made after decisionmakers decided to terminate him).  She spoke informally with Nunziato, *see* Pl.'s Interview Notes 01/19/2016 ¶¶ 10–11, complained to a union representative who passed her complaint along to Nunziato, Reinert, and Jacksonville

Assistant Superintendent Banks, *see id.* ¶¶ 10, 18; Pl.'s Dep. at 128:1–18, and wrote a letter to Amtrak's CEO, *see* Boardman Letter.[7]

But Hines testified that he did not know about any of these complaints.  Hines Dep. at 96:19–22, 111:1–10.  And the Court has not found any evidence to cast doubt on his testimony. As the System General Road Foreman, Hines oversaw engineer certification and training from Wilmington, Delaware.  *See id.* at 11:18–12:22; Decision Letter.  He was a couple management levels removed from road foremen Nunziato and Reinert (where Banks fits into the hierarchy is unclear).  *See* Hines Dep. at 88:1–21.  In fact, Hines ordinarily left certification decisions to system road foremen and decided Klotzbach-Piper's certification himself only because Assistant Superintendent Kenner asked him to.  *Id.* at 86:12–16, 88:1–89:10.  Given the bureaucratic distance between Hines and Klotzbach-Piper, it makes sense that he may not have necessarily been clued in on every complaint she made to her supervisor.  Likewise, there is no evidence indicating that Klotzbach-Piper's complaint to Amtrak's CEO found its way to Hines before he made the noncertification decision.  *See* Mian Decl., Ex. 4 (letter from Amtrak's Equal Employment Opportunity Compliance Office acknowledging receipt of Klotzbach-Piper's complaint to the CEO just two days before Hines wrote his decision letter); Pl.'s Interview Notes 01/19/2016 (notes from an equal employment opportunity investigator's interview with Klotzbach-Piper dated several days after Hines's decision letter).  And Klotzbach-Piper apparently recognized Hines's likely ignorance.  In response to his decision letter, she provided a detailed recitation of Shaw and Martone's harassment as well as her complaints to Nunziato, her union representative, and Banks.  *See* Decision Letter Resp. at 1–3.

---

[7] Klotzbach-Piper also filed written complaints with her union representative after Nunziato warned her that she may not qualify on the Jacksonville-Florence route, but those complaints did not mention sex- or age-based harassment.  *See* Pl.'s Dep., Exs. 15–16.

One could certainly speculate that Hines might have somehow heard about Klotzbach-Piper's complaints of harassment.  But "an employee cannot survive summary judgment if a jury can do no more than 'speculate' that her employer knew of her protected activity."  *Morris*, 825 F.3d at 674 (quoting *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011)).  Because Klotzbach-Piper has not pointed to any evidence that Hines knew about her complaints, Amtrak is entitled to summary judgment on her Title VII and ADEA retaliation claims.  *Cf. Taborn v. Wash. Metro. Area Transit Auth.*, 209 F. Supp. 3d 68, 72 (D.D.C. 2016) (granting employer summary judgment on retaliation claim because plaintiff did "not come forward with any evidence" showing that the person who fired him knew about his EEOC complaint); *Lane v. Vasquez*, 961 F. Supp. 2d 55, 74 (D.D.C. 2013) (granting employer summary judgment on retaliation claim because the decisionmaker testified that she did not know about the plaintiff's complaint to her superior and the plaintiff "offer[ed] little more than speculation" to contest that testimony).

As if Hines's unawareness was not enough to warrant summary judgment, a reasonable jury also could not find that Klotzbach-Piper would have received certification absent a retaliatory motive.  Unlike discrimination claims under Title VII, retaliation claims under both Title VII and the ADEA require a plaintiff to show that her protected activities were a but-for cause of the employer's adverse action.  *See Guerrero v. Vilsack*, 134 F. Supp. 3d 411, 427 (D.D.C. 2015); *see also Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *Gross*, 557 U.S. at 177–78.  Working against Klotzbach-Piper on that score is all the evidence the Court described earlier in its analysis of her discrimination claims: dozens of poor evaluations from several different instructors, documented mistakes in her qualifying rides, and Hines's independent assessment that she was unfit to be certified as an engineer.  *See* Decision Letter; Pl.'s Dep., Exs. 1–3, 5, 8–11.  Klotzbach-Piper supplies no countervailing evidence that Hines

acted out of a retaliatory motive.  And once again, the only evidence the Court can come up with

in her favor is the temporal proximity between her complaints—particularly her December 2015

complaint to Amtrak's CEO—and Hines's January 2016 decision.  "But when an employer

comes forward with a legitimate, nonretaliatory reason for an employment action, 'positive

evidence beyond mere proximity' is required 'to create a genuine issue of material fact

concerning whether the motive for [an adverse employment action] was . . . retaliation." *Minter*,

809 F.3d at 71–72 (alteration and omission in original) (quoting *Solomon v. Vilsack*, 763 F.3d 1,

16 (D.C. Cir. 2014)).  Klotzbach-Piper has thus failed to raise a genuine question about Hines's

motives, so Amtrak deserves summary judgment on her Title VII and ADEA retaliation claims.

### D.  Klotzbach-Piper's Hostile Work Environment Claims

Klotzbach-Piper's hostile work environment claims are the last ones standing.  She seeks

to hold Amtrak liable under Title VII and the ADEA for Shaw and Martone's sex- and age-based

harassment.  *See* Compl. ¶¶ 97–109.  Those statutes prohibit "'discriminatory intimidation,

ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment.'"  *Baloch v. Kempthorne*, 550 F.3d

1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Whether a hostile work environment existed depends on "the totality of the circumstances,

including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether

it interferes with an employee's work performance."  *Id.*

Amtrak does not even try to argue that Shaw and Martone's treatment of Klotzbach-

Piper—which included calling her a "bitch," a "grandmother," and a member of the

"Alzheimer's club," *see, e.g.* Mian Decl., Ex. 5—was nondiscriminatory.  It denies only that the

behavior rose to such a level of severity or pervasiveness that it altered the conditions of her

employment.  *See* Def.'s Mot. at 26–30.  The Court thus focuses its analysis on that question.
*See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016) ("The burden is
always on the movant to demonstrate why summary judgment is warranted." (citation omitted)).
For support, Amtrak draws heavily on cases warning that federal antidiscrimination laws are not
meant to be a "general civility code" and are instead concerned with "extreme" conduct.  *See*
Def.'s Mot. at 27–28 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

But Amtrak understates what Klotzbach-Piper alleges that Shaw and Martone did.  From
September 2014 to when Shaw left his job in February 2015, Shaw and Martone regularly
subjected Klotzbach-Piper to verbal, physical, and sexual harassment.  They called her belittling,
animus-laden names like "bitch" and "grandmother."  *See, e.g.*, Def.'s SMF ¶ 119; Pl.'s
Interview Notes 01/19/2016 ¶¶ 8, 14.  And they made fun of her age by joking that she had
Alzheimer's disease.  *See, e.g.*, Pl.'s Interview Notes 01/19/2016 ¶ 17; Williamson Dep. at 56:3–
6.  The name-calling was not an isolated incident.  Klotzbach-Piper told Amtrak investigators
that Shaw called her a "bitch" "just about every trip" she took with him.  Pl.'s Interview Notes
5/17/2016 ¶ 7.; *cf. Passananti v. Cook Cty.*, 689 F.3d 655, 669 (7th Cir. 2012) (explaining that a
supervisor calling "the plaintiff a 'bitch' to her face" and "in front of her co-workers" "nearly
constantly for several years" contributed to a hostile work environment); *Carter v. Chrysler
Corp.*, 173 F.3d 693, 702 (8th Cir. 1999) (same, when a male coworker called the plaintiff
"bitch" almost every other day for two years).  She also said that Shaw and Martone "constantly"
insulted her.  Pl.'s Interview Notes 5/17/2016 ¶ 36.  Other evidence in the record corroborates
her claim that the verbal abuse was frequent.  *See, e.g.*, Williamson Dep. at 37:17–18 ("Every
time she got on the engine, [Shaw and Martone] would complain about having to train her."); *id.*

at 38:19–40:4 (remarking how Shaw improved his behavior for "maybe one trip" after Williamson confronted him).

In addition to the insults, Shaw and Martone kicked Klotzbach-Piper, poked her, and hit her while she was operating the train. *See* Def.'s SMF ¶ 119; Pl.'s Interview Notes 01/19/2016 ¶¶ 8, 45; *cf. Riley v. Salazar*, 399 F. App'x 190, 192 (9th Cir. 2010) (reversing grant of summary judgment to employer when, among other things, the plaintiff's supervisor called her a "bitch," "hit the back of her chair," and "made sexist and discriminatory comments"). Klotzbach-Piper specified that they kicked her "several times." *See* Pl.'s Interview Notes 01/19/2016 ¶¶ 9, 43, 45. And they kicked her so hard that she developed bruises on her legs. *Id.* ¶ 9.

Some of the abuse was sexual too. Shaw and Martone frequently made sexual comments to Klotzbach-Piper and Williamson. *See* Williamson Dep. at 48:11–12 ("[Shaw] had a very dirty mouth. Everything was about human feces and sexual copulation."); Pl.'s Dep. at 54:18–19 ("[Shaw] would make comments that were inappropriate."); Pl.'s Interview Notes 01/19/2016 ¶ 17 (describing "sexual comments" as "out of hand"). Even worse, Shaw and Martone brushed up against Klotzbach-Piper's breasts and chest when there was plenty of room in the train to avoid physical contact. Pl.'s Interview Notes 01/19/2016 ¶ 9; *see also* Pl.'s Dep. at 54:19–20 ("[Shaw] would make physical contact with me that was inappropriate."); *cf. Smith v. Ergo Sols., LLC*, No. 14-cv-382, 2019 WL 147718, at *10 (D.D.C. Jan. 9, 2019) (holding that the plaintiffs' coworker contributed to a hostile work environment when he "positioned himself so that plaintiffs would have to rub against him to perform their job duties"). According to an Amtrak investigator's notes, Klotzbach-Piper reported that they inappropriately brushed against her "on numerous occasions." Pl.'s Interview Notes 5/17/2016 ¶ 15; *cf. Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 43 (6th Cir. 2009) (holding that a plaintiff who showed that her

supervisor "physical[ly] touch[ed her] on at least two occasions" had raised a fact issue on whether there was a hostile work environment and citing a case for the proposition that "conduct including a physical invasion could 'at minimum . . . raise[] a question of fact for the jury'" (omission and second alteration in original) (citation omitted)).

Klotzbach-Piper claims that she developed anxiety as a result of Shaw and Martone's behavior.  Pl.'s Interview Notes 01/19/2016 ¶ 54; *cf. Smith v. City of New Smyrna Beach*, 588 F. App'x 965, 980 (11th Cir. 2014) ("Smith testified that she developed anxiety and depression as a result of the alleged discriminatory conduct.  Although psychological injury is not necessary to establish a hostile work environment claim, it is relevant to the question of whether the environment is sufficiently severe or pervasive.").  She began to suffer daily anxiety attacks, Pl.'s Interview Notes 6/03/2016 ¶ 9, and ended up having to take over three months of medical leave.  *See* Def.'s SMF ¶ 98; Pl.'s Interview Notes 6/03/2016 ¶ 9; *see also* Statement of Disability (medical professional attesting in leave-request form that Klotzbach-Piper was "totally, but temporarily disabled" due to her anxiety); *cf. Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 446 (5th Cir. 2017) (finding relevant to the hostile work environment analysis evidence that "harassment contributed to the anxiety that forced [the plaintiff] to miss work, thus interfering with his work performance").

Similar conduct at issue in another suit against Amtrak raised a fact issue as to whether harassment was severe or pervasive enough to alter a condition of the plaintiff's employment.  In *Leach v. National Railroad Passenger Corp.*, 128 F. Supp. 3d 146 (D.D.C. 2015), a female mechanic challenged "sexual harassment in the form of vulgar insults, demeaning workplace graffiti, life-threatening mischief, and extreme hostility toward women."  *Id.* at 150.  Coworkers frequently called the plaintiff "freak ho" and "bitch," drew sexual graffiti on the plaintiff's

identification card, and "repeatedly" took the plaintiff's identification card from a board meant to

prevent accidents by indicating when someone is working beneath a train. *Id.* at 151. In one

instance, a coworker "plac[ed] his genitals in [the plaintiff's] face" when she bent down to work

on a train car. *Id.* And in another, a "coworker str[uck] her" with a train car. *Id.* The court

denied Amtrak summary judgment on the plaintiff's hostile work environment claim, reasoning

in part that "a reasonable juror could find that [she] suffered severe and pervasive harms that

differ substantially from 'ordinary [workplace] tribulations.'" *Id.* at 155 (second alteration in

original) (quoting *Brooks v. Grundmann*, 748 F.3d 1273, 1277 (D.C. Cir. 2014)).

The same is true for Klotzbach-Piper. She too asserts that she endured regular

discriminatory insults, sexual harassment (both physical and verbal), and even bodily injury.

Contrary to what Amtrak says, her experience cannot be considered ordinary for a workplace. A

jury could find the harassment sufficiently extreme to conclude that it affected a condition of

Klotzbach-Piper's employment.[8] She can take her hostile work environment claims to trial.

---

[8] A plaintiff who challenges harassment by coworkers rather than a supervisor must also show "that the employer was at least negligent in not preventing or correcting the harassment." *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013). Because Shaw and Martone could not take tangible employment actions against Klotzbach-Piper like fire her or reassign her, they were her coworkers. *See Vance v. Ball State Univ.*, 570 U.S. 421, 431 (2013). Klotzbach-Piper repeatedly complained to Nunziato and filed a formal complaint that made its way to Reinert and Assistant Superintendent Banks. *See* Pl.'s Interview Notes 01/19/2016 ¶¶ 10–11; Pl.'s Dep. at 128:1–18. Amtrak management did little more than speak to Shaw and Martone. *See* Pl.'s Interview Notes 01/19/2016 ¶¶ 11, 47; Pl.'s Dep. at 128:3–18. Klotzbach-Piper could thus raise a factual issue as to Amtrak's negligent response. *Cf. Ashraf-Hassan v. Embassy of France*, 695 F. App'x 579, 582 (D.C. Cir. 2017) (affirming district court's finding that, after a plaintiff "repeatedly complained of harassment . . . to higher-ups," the employer "knew or should have known of the harassment"). Amtrak does not argue otherwise. *Cf. Craig v. District of Columbia*, 74 F. Supp. 3d 349, 373 (D.D.C. 2014) ("In the absence of appropriate briefing by the Defendants, and in light of the record presently before the Court, the Court cannot conclude as a matter of law that [the plaintiff] has failed to establish the [employer's ]negligence.").

## V.  CONCLUSION

For the foregoing reasons, Amtrak's motion for summary judgment (ECF No. 29) is

**GRANTED IN PART AND DENIED IN PART**.  An order consistent with this Memorandum

Opinion is separately and contemporaneously issued.


Dated:  September 3, 2021                                    RUDOLPH CONTRERAS
                                                       United States District Judge