**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| KAREN KLOTZBACH-PIPER, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 18-1702 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 46, 47, 48, 49, 50 |
| | : | | |
| NATIONAL RAILROAD | : | | |
| PASSENGER CORPORATION, | : | | |
| Defendant. | : | | |

**MEMORANDUM OPINION**

**GRANTING CERTAIN RELIEF REQUESTED IN DEFENDANT'S MOTIONS *IN LIMINE*; DEFERRING
RULING ON CERTAIN RELIEF REQUESTED IN DEFENDANT'S MOTIONS *IN LIMINE*; DENYING
CERTAIN RELIEF REQUESTED IN DEFENDANT'S MOTIONS *IN LIMINE*; GRANTING IN PART
PLAINTIFF'S MOTION *IN LIMINE*; AND DEFERRING RULING ON CERTAIN RELIEF REQUESTED
IN PLAINTIFF'S MOTION *IN LIMINE***

## I.  BACKGROUND

Plaintiff Karen Klotzbach-Piper worked for Defendant National Railroad Passenger

Corporation, better known as Amtrak, for almost thirty years.  *Klotzbach-Piper v. Nat'l R.R.

Passenger Corp.*, No. CV 18-1702, 2021 WL 4033071, at *1 (D.D.C. Sept. 3, 2021).  Early in

her career she became a certified locomotive engineer, but let that certification lapse in order to

take on other roles with Amtrak.  *Id.*  However, in 2014, wishing to move south, she succeeded

in bidding for a job as a locomotive engineer in Jacksonville, Florida.  *Id.*  She needed to

recertify as an engineer in order to work in this position, so upon her start in Jacksonville,

Amtrak put her on a training program for recertification.  *Id.*  While training, fellow engineers

Phillip Shaw and Christopher Martone allegedly "called her names, hit her when she operated

the train, and touched her inappropriately."  *Id.*  Amtrak ultimately refused to recertify

Klotzbach-Piper as a locomotive engineer, explaining that she had performed deficiently during

training.  *Id.* at 3.

Klotzbach-Piper sued Amtrak, alleging that the non-certification decision was the result of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), and disability discrimination in violation of the Americans with Disabilities Act of 1990 ("ADA").  Compl. at 19–20, 24, ECF No. 1.  She also brought claims of retaliation for protected activity under Title VII, the ADEA, and the Family and Medical Leave Act.  *Id.* at 21–25.  Finally, she alleged that Amtrak subjected her to a discriminatory hostile work environment in violation of both Title VII and the ADEA.  Compl. at 17–19.  The Court dismissed some of these claims for failure to exhaust administrative remedies, and then granted summary judgment in favor of Amtrak on all remaining claims except for the hostile work environment claims.  *Klotzbach-Piper*, 2021 WL 4033071, at *1, *4.  As relevant here, the Court held that the evidence could not give rise to a reasonable inference that any sex or age discrimination was a but-for or proximate cause of Amtrak's decision to deny Klotzbach-Piper recertification as a locomotive engineer.  *Id.* at *12–13.  The summary judgment record showed that, even if some of her evaluators had harbored discriminatory animus, these evaluations were not a but-for cause of the recertification decision because Klotzbach-Piper also "received consistently poor reviews from evaluators whom she [did] not allege harbored sex- or age-related animus."  *Id.* at 12.  Moreover, these "poor reports from unbiased evaluators" "ma[de] any connection between . . . [discriminatory] animus and the noncertification decision too attenuated to constitute proximate cause."  *Id.*

The parties have filed motions *in limine* in advance of the trial on the sole remaining claims, for a hostile work environment under Title VII and the ADEA.  Throughout its motion-*in-limine* briefing, Amtrak states that "the only issues for the jury to decide are: (1) whether Plaintiff was subjected to a hostile work environment based on sex in violation of Title VII; (2)

whether Plaintiff was subjected to a hostile work environment based on age in violation of the ADEA; (3) whether Amtrak can be held liable for [Plaintiff's] coworkers' alleged harassment based on a negligence standard; and (4) the damages [Plaintiff] can recover if Amtrak is liable." *See, e.g.*, Def.'s Resp. Pl.'s Proffer Regarding Testimony of Helen Gage Williamson at 1 ("Def.'s Resp. Pl.'s Proffer"), ECF No. 59.  Klotzbach-Piper does not expressly object to this characterization of the remaining issues for trial, and, consistent with the analysis below, the Court agrees that these are the sole remaining issues for trial.  *See Klotzbach-Piper*, 2021 WL 4033071, at *15–17, *17 n.8.  The parties also filed a pretrial statement, in which Klotzbach-Piper states that she seeks $414,458.00 in back pay, $354,982.00 in front pay, $1,043,071.00 in pension losses, $300,000.00 in compensatory damages for pain and suffering, and attorney's fees.  Pretrial Statement at 8, ECF No. 45.

## II.  LEGAL STANDARDS

While neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly provide for motions *in limine*, the Court may allow such motions "'pursuant to the district court's inherent authority to manage the course of trials.'"  *Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)).  "Motions *in limine* are designed to narrow the evidentiary issues at trial."  *Williams v. Johnson*, 747 F. Supp. 2d 10, 14 (D.D.C. 2010).  Importantly, a trial judge's discretion "extends not only to the substantive evidentiary ruling, but also to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial."  *Barnes*, 924 F. Supp. 2d at 79 (quoting *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 11 (D.D.C. 2011)).  "[A] motion *in limine* should not be used to resolve factual disputes or weigh evidence."  *C & E Servs., Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008)

(citation omitted).  "Rather, parties should target their arguments to demonstrating why certain

categories of evidence should (or should not) be introduced at trial, and direct the district court to

specific evidence in the record that would favor or disfavor the introduction of those particular

categories of evidence."  *Williams*, 747 F. Supp. 2d at 14.

"In evaluating the admissibility of proffered evidence on a pretrial motion *in limine* the

court must assess whether the evidence is relevant and, if so, whether it is admissible, pursuant to

Federal Rules of Evidence 401 and 402."  *Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 66

(D.D.C. 2014).  "Evidence is relevant if: (a) it has any tendency to make a fact more or less

probable than it would be without the evidence; and (b) the fact is of consequence in determining

the action."  Fed. R. Evid. 401.  Relevant evidence is admissible unless otherwise provided by

the U.S. Constitution, a federal statute, the Federal Rules of Evidence, or other rules prescribed

by the U.S. Supreme Court.  *See* Fed. R. Evid. 402.  "Irrelevant evidence is not admissible."  *Id.*

Further, Federal Rule of Evidence 403 provides that a court may "exclude relevant evidence if its

probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the

issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative

evidence."  Fed. R. Evid. 403.  "The burden is on the introducing party to establish relevancy as

well as admissibility."  *Corrigan v. Glover*, 254 F. Supp. 3d 184, 191 (D.D.C. 2017) (cleaned

up).

## III.  ANALYSIS

### A.  Defendant's Motions *In Limine*

1.  Amtrak's Motion to Exclude Dismissed Claims and Economic Damages – ECF No. 48

Amtrak seeks an order precluding Klotzbach-Piper from "(1) calling any witnesses to

testify; (2) introducing any other evidence; (3) offering any argument; and (4) recovering any

economic damages related to her non-certification as a locomotive engineer and non-selection for other positions at Amtrak." Def.'s Mem. Supp. Mot. *In Lim.* to Exclude All Evid. of Pl.'s Dismissed Discrimination and Retaliation Claims and Economic Damages at 6 ("Def.'s Dismissed Claims and Economic Damages Mem."), ECF No. 48-1. Among other things, this would require the exclusion of the testimony of Klotzbach-Piper's economic expert Joseph Rosenberg, *id.*, who plans to testify that, apparently as a result of the non-certification decision, Klotzbach-Piper stopped working "prior to reaching the thirty years of employment with Amtrak that would have resulted in her receiving a full pension," Pl.'s Suppl. Resp. Regarding Expert Testimony at 2, ECF No. 56; *see* Def.'s Mem. Supp. Mot. *In Lim.* to Limit Pl.'s Damages at 2 n.2, ECF No. 49-1 ("Ms. Klotzbach-Piper contends that but for Amtrak's re-certification decision, she would have continued working until she had accrued sufficient service credit to retire with 30 years of service and would not have experienced a reduction in the value of her annuity."). In support of its motion, Amtrak reasons that the non-certification decision was the basis for the discrimination and retaliation claims that the Court has already disposed of, and therefore has no relevance to the two hostile work environment claims that remain for trial. Def.'s Dismissed Claims and Economic Damages Mem. at 4–5.

In response, Klotzbach-Piper does not draw any clear connection between her hostile environment claims and the non-certification decision. Instead, she says that "the hostile work environment claim[s are] still outstanding and there has not been a decision regarding whether Amtrak intentionally discriminated against Plaintiff by allowing a hostile work environment to occur." Pl.'s Opp'n Def.'s Mot. *In Lim.* to Limit Pl.'s Damages at 3, ECF No. 53-1; Pl.'s Opp'n Def.'s Mot. *In Lim.* to Exclude All Evid. of Pl.'s Dismissed Discrimination and Retaliation Claims and Economic Damages at 3, ECF No. 52 (incorporating by reference arguments made in

opposition to Amtrak's Motion in *Limine* to Limit Plaintiff's Damages and noting that "the hostile work environment claim[s are] still outstanding and there has not been a decision regarding whether Amtrak intentionally discriminated against Plaintiff by allowing a hostile work environment to occur"). Fair enough, but this response does not "direct the district court to specific evidence in the record," *Williams*, 747 F. Supp. 2d at 14, to suggest that the non-certification decision and any consequences flowing from it are in any way relevant to the hostile work environment claims. Indeed, Rosenberg's damages reports attribute the pension losses at least partially to alleged retaliation, and do not draw any connection between the hostile working environment allegedly perpetrated by Shaw and Martone and the non-certification decision. Original Rosenberg Report at 5, Pl.'s Ex. 15 ("Ms. Klotzbach-Piper was unable to accrue additional service months resulting from the unlawful retaliatory actions of [road foremen] Mr. Reinert and Nunziato."); Updated Rosenberg Report at 5, 8, Pl.'s Ex. 15 (same and calculating "Expected Income Losses Due to Retaliatory Denial of Re-Entry Engineer Certification").

Accordingly, it appears to the Court that evidence regarding the non-certification decision and its consequences is only marginally relevant to Klotzbach-Piper's remaining claims, if it is relevant at all, and that its introduction at trial would confuse the jury. *See* Fed. R. Evid. 401, 403. Klotzbach-Piper may not introduce such evidence, including Rosenberg's testimony and other evidence in support of back pay, front pay, or pension losses at trial, nor may she make related arguments at trial. Further, she may not introduce other evidence or argument that relates solely to discrimination and retaliation claims that no longer remain in the case. She may of course introduce evidence of the harassment she allegedly suffered and of Amtrak's knowledge of and response to such harassment, as well as evidence in support of her claim for Title VII compensatory damages, which are defined to include only "future pecuniary losses, emotional

pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses."[1]  *Nesbitt v. Holder*, 34 F. Supp. 3d 192, 194 (D.D.C. 2014) (quoting 42 U.S.C. § 1981a(b)(3)).  Thus, for example, she can present evidence relevant to any emotional distress she allegedly suffered as a result of the alleged hostile work environment.  *See* Pretrial Statement at 8 (noting Klotzbach-Piper's intent to seek $300,000 in damages for "Pain & Suffering").

Even setting aside the apparent irrelevance of the non-certification decision, there are good reasons for precluding Klotzbach-Piper from presenting evidence related to lost compensation, such as back pay or lost retirement benefits.  Notwithstanding some vague suggestions in the briefing, *see* Pl.'s Suppl. Resp. Regarding Expert Testimony at 2, it is not clear from the record that Amtrak ever terminated Klotzbach-Piper or even that she voluntarily resigned.  *See, e.g.*, Compl. ¶ 96 (alleging that Klotzbach-Piper unsuccessfully applied for other jobs at Amtrak upon receipt of the letter denying her certification to be a locomotive engineer, but not alleging that Amtrak terminated her from her position or that she resigned).  The extent to which any termination or resignation related to the non-certification, much less to the alleged hostile environment, is even less clear.  *See* Original Rosenberg Report at 4, Pl.'s Ex. No. 15 (noting that "Amtrak did not terminate [Klotzbach-Piper's] employment" upon deciding not to certify her, but that she had for a time worked without pay when struggling to qualify for certification).

This is a problem because "absent actual termination or other discriminatory discharge, proof of constructive discharge is required in order to award a successful Title VII plaintiff with

---

[1] For employers who have more than 500 employees, Title VII compensatory damages are subject to a statutory cap of $300,000.  42 U.S.C. § 1981a(b)(3)(D).

equitable relief in the form of front pay or back pay."[2]  *Brown v. District of Columbia*, 768 F.

Supp. 2d 94, 101 (D.D.C. 2011) (Kay, Mag. J.), *aff'd*, 493 F. App'x 110 (D.C. Cir. 2012)

(unpublished per curiam judgment).  As the Third Circuit has explained, "a successful hostile

work environment claim alone, without a successful constructive discharge claim, is insufficient

to support a back pay award."  *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir.

2006).  "Put simply, if a hostile work environment does not rise to the level where one is forced

to abandon the job, loss of pay is not an issue," and, it stands to reason, nor is other equitable

relief that might result from a discharge such as lost retirement benefits.  *Id.* & n.6 (collecting

authorities from other circuits); *see also Holmes v. Wal-Mart Stores E., L.P.*, No. 10CV75, 2011

WL 1842868, at *8 n.30 (E.D. Va. Apr. 27, 2011) ("It is well-settled that a hostile work

environment claim, alone, is not sufficient to warrant back pay and reinstatement because a

hostile work environment does not cause loss of pay or discharge, and hence back pay and

reinstatement would not make a plaintiff whole.").  One court held that the absence of a

discharge defeated a Title VII hostile environment claim for back pay even where the plaintiff

---

[2] It is well settled that under Title VII, back pay and similar awards such as lost benefits are equitable in nature and that the district court has broad discretion in fashioning such equitable remedies.  *See Robinson v. District of Columbia*, 341 F. Supp. 3d 97, 105 (D.D.C. 2018).  As the decision on equitable remedies in a Title VII case is left to the court, often to be determined in a post-trial proceeding once a jury has decided liability and compensatory damages issues, courts have relied on Federal Rule of Evidence 403 to preclude the submission of evidence related to equitable relief to the jury.  *See Banks v. Vilsack*, 958 F. Supp. 2d 78, 83 (D.D.C. 2013); *Youssef v. FBI*, 762 F. Supp. 2d 76, 84–85 (D.D.C. 2011), *aff'd in part*, 687 F.3d 397 (D.C. Cir. 2012).  However, at least as far as Klotzbach-Piper's request for back pay is concerned, these cases have limited relevance to this one, which presents a Title VII hostile environment claim alongside an ADEA hostile environment claim.  Unlike under Title VII, under the ADEA, back pay is a legal remedy and is properly determined by the jury.  *See EEOC v. Baltimore Cnty.*, 904 F.3d 330, 334–36 (4th Cir. 2018) (per curiam); *Sailor v. Hubbell, Inc.*, 4 F.3d 323, 325–26 & 326 n.5 (4th Cir. 1993).

did not seek compensation lost as a result of discontinuing her job, but rather "continued to work in a hostile work environment and sought back pay for a lost job opportunity" in the form of "a salary differential she would have earned if she had received higher paying temporary assignments." *Hare v. Potter*, 549 F. Supp. 2d 688, 693–95 (E.D. Pa. 2007).[3]  Assuming she was not formally terminated, to prove a constructive discharge, Klotzbach-Piper would have to show not only that she was subject to a hostile work environment but also that there were "aggravating factors that suggest that [she] was driven to quit."  *Burrell v. Shepard*, 321 F. Supp. 3d 1, 14 n.3 (D.D.C. 2018) ("[A] claim for constructive discharge requires something more than a hostile work environment claim alone . . . the kinds of situations where courts have upheld constructive-discharge findings tend to involve extreme mistreatment or thinly veiled (or even overt) threats of termination." (cleaned up and citations omitted)); *Steele v. Schafer*, 535 F.3d 689, 695 (D.C. Cir. 2008) ("[T]o establish constructive discharge, the plaintiff must make a further showing: She must show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." (cleaned up)).

Though the case law is less plentiful in the ADEA hostile environment context, it appears that a showing of discharge (actual or constructive) is normally a prerequisite to an award of lost compensation there, as well.  *See* Cecily Fuhr, 92 Causes of Action 2d 207 § 27 ("In a hostile work environment action, back pay will obviously be available only in cases where the hostile work environment resulted in the plaintiff being forced either to miss work, or to resign in order to avoid the hostile environment, thus resulting in a constructive discharge. . . . [B]ack pay will

---

[3] *Hare* suggests that, in connection with her Title VII hostile environment claim, Klotzbach-Piper could not recover equitable lost compensation relief even for any losses short of a formal or constructive termination, such as, for example, the periods in which she worked without pay and/or stopped reporting to work.  *See* Original Rosenberg Report at 4, Pl.'s Ex. No. 15; *Klotzbach-Piper*, 2021 WL 4033071, at *3.

not be appropriate in cases where the hostile work environment did not result in the employee's direct or constructive termination, or in any loss of compensation."); *cf. Nance v. Maxwell Fed. Credit Union (MAX)*, 186 F.3d 1338, 1342 (11th Cir. 1999) (explaining, in the context of an ADEA discrimination claim, that "[t]he only way that [defendant's] actions could be considered the cause of [plaintiff's] lost salary and benefits would be if [defendant's] actions constituted a constructive discharge—in other words, if [the challenged actions] made the thought of working at [the employer] so unpleasant that [plaintiff] reasonably felt compelled to resign"); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 454 (7th Cir. 2011) (holding, in the context of an ADEA discrimination claim, that "[the Plaintiff] was not fired and his compensation was not reduced, so an award of back pay is unavailable").  To be sure, *Barton* and cases like it seem to allow for the possibility of an ADEA award of lost compensation that results from something less than a discharge, at least outside the hostile environment context.  But Klotzbach-Piper has not articulated any theory connecting the alleged hostile environment to any loss of compensation, pre-discharge or otherwise.  Accordingly, Klotzbach-Piper shall be precluded from introducing evidence related to back pay, front pay, or pension losses at trial.

The Court is cognizant of the fact that the reasoning underlying its holding today—based on relatively terse briefing accompanying motions *in limine*—substantially reduces the scope of Klotzbach-Piper's claimed recovery.  Moreover, in the Complaint, Klotzbach-Piper alleged that her failure to obtain recertification was the "direct and proximate result" of the alleged hostile working environment, as were lost wages and benefits.[4]  Compl. ¶¶ 103, 109.  Accordingly, and

---

[4] It is true that the Court's summary judgment opinion held that the non-certification was caused not by tainted, discriminatory evaluations from Shaw and Martone, or by retaliation against protected activity, but rather by Klotzbach-Piper's failure to meet the performance criteria for recertification.  *Klotzbach-Piper*, 2021 WL 4033071, at *10–15.  However, contrary to Amtrak's suggestion, *see* Def.'s Mem. Supp. Mot. *In Lim.* to Limit Pl.'s Damages at 4, these

given that there is plenty of time left before the December trial in this case, the Court's grant of ECF No. 48, Amtrak's Motion *In Limine* to Exclude All Evidence of Plaintiff's Dismissed Discrimination and Retaliation Claims And Economic Damages, shall be without prejudice to reconsideration based on supplemental briefing.  *Cf. Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 72 F. Supp. 3d 131, 151 (D.D.C. 2014).  Should Klotzbach-Piper wish to move for reconsideration, she must submit a proffer, with citations to evidentiary support, detailing her theory of how *the alleged hostile working environment* caused the non-certification decision, and/or any actual or constructive discharge, and/or how *the alleged hostile working environment* otherwise caused any loss of compensation or benefits (i.e., before any discharge).  This filing must also cite and discuss apposite legal authority and explain why any lost compensation or benefits allegedly caused by the hostile working environment are recoverable consistent with the legal principles outlined in this opinion.

2.  Amtrak's Motion to Limit Plaintiff to Compensatory and/or Nominal Damages – ECF No. 49

In its next motion *in limine*, Amtrak raises identical arguments in support of a request for an order limiting Plaintiff's damages to compensatory damages under Title VII and nominal damages under the ADEA.  Def.'s Mot *In Lim.* to Limit Plaintiff's Damages to Compensatory Damages and/or Nominal Damages, ECF No. 49.  In terms of damages, the ADEA provides only for lost compensation, and, for willful violations, liquidated damages in an amount equal to the

---

holdings do not logically foreclose Klotzbach-Piper from arguing that a discriminatory hostile work environment caused the non-certification decision and resulting consequences, perhaps by interfering with Klotzbach-Piper's work performance such that she could not meet performance standards she otherwise would have satisfied.  Indeed, the Complaint alleges that the hostile environment, not just intentional discrimination and retaliation, caused the non-certification decision.  Compl. ¶¶ 103, 109.

lost compensation awarded.[5]  *See* 29 U.S.C. § 626(b); *McKennon v. Nashville Banner Pub. Co*., 513 U.S. 352, 357 (1995).  As explained above, Klotzbach-Piper may not introduce any evidence to support lost compensation or benefits under the ADEA; it follows that she may not introduce any evidence in support of liquidated damages.

While the Court largely agrees with Amtrak's arguments and, accordingly, has held that Klotzbach-Piper may not introduce evidence or argument in support of back pay, front pay, or pension losses, it would not be appropriate at the motion *in limine* stage to issue an order of the sort Amtrak requests: an order limiting plaintiff's damages without any nexus to the exclusion of evidence.  *See* Def.'s Proposed Order, ECF No. 49-2 ("[I]t is hereby ORDERED that: Defendant's Motion *in limine* is GRANTED; and [i]t is further ORDERED that Plaintiff's damages, if any, shall be limited to compensatory damages (capped at $300,000) and/or nominal damages.").  A trial judge's discretion in ruling on a motion *in limine* "extends not only to the substantive evidentiary ruling, but also to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial."  *Barnes*, 924 F. Supp. 2d at 79 (quoting *Graves*, 850 F. Supp. 2d at 11 (D.D.C. 2011)).  Accordingly, the Court declines to issue an order in the form Amtrak requests, which would not relate to any evidentiary issue.  Moreover, the proposed order would bar Klotzbach-Piper from pursuing her plan to seek punitive damages under Title VII, *see* Pl.'s Mem. Opp'n Def.'s Mot. *In Lim.* To Limit Pl.'s Damages at 3, but Amtrak does not present any argument in support of such a result in connection with the instant motion.[6]

---

[5] The ADEA also provides for equitable relief such as compelled "reinstatement or promotion."  29 U.S.C. § 626(b).

[6] The Court will address Amtrak's separate motion regarding punitive damages below. *See infra* Part III.A.3.

However, for the avoidance of doubt, the Court construes Amtrak's motion as a request to exclude evidence and argument related to any form of relief other than Title VII compensatory damages, which are defined to include only "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses," *Nesbitt*, 34 F. Supp. 3d at 194 (quoting 42 U.S.C. § 1981a(b)(3)), punitive damages under Title VII, *see infra* Part III.A.3, and nominal damages under the ADEA.  For the reasons explained in Part III.A.1, the Court grants the motion to the extent it requests this evidentiary relief.

3.  Amtrak's Motion to Preclude or Bifurcate Punitive Damages – ECF No. 47

In its next motion, Amtrak requests that "the Court bifurcate the trial and prohibit Plaintiff from claiming or requesting any specific amount or amounts of punitive damages unless and until Plaintiff establishes a *prima facie* case of liability for a hostile work environment based on sex and resulting actual damages, and proves, by clear and convincing evidence that Amtrak acted with malice, oppression or fraud." Def.'s Mem. Supp. Mot. *In Lim.* to Bifurcate Punitive Damages at 2, ECF No. 47-1.  The Court denies the motion.

Amtrak notes, and Klotzbach-Piper does not dispute, that to obtain punitive damages, Klotzbach-Piper must both prevail on her Title VII[7] hostile work environment claim and demonstrate that Amtrak acted "with malice or with reckless indifference to [her] federally protected rights." *Robinson v. Ergo Sols., LLC*, 4 F. Supp. 3d 171, 180 (D.D.C. 2014) (quoting 42 U.S.C. § 1981a(b)(1)); *see* Def.'s Mem. Supp. Mot. *In Lim.* to Bifurcate Punitive Damages at 3; Pl.s' Opp'n Def.'s Mot. *In Lim.* to Bifurcate Punitive Damages at 2, ECF No. 51-1.  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be

---

[7] At the Pretrial Conference, Klotzbach-Piper conceded that punitive damages are not available under the ADEA.

acting in violation of federal law, not its awareness that it is engaging in discrimination."
*Robinson*, 4 F. Supp. 3d at 180 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)).
Amtrak argues that there is no evidence that it acted with malice or reckless indifference; indeed,
it has an anti-harassment and anti-discrimination policy and investigated Klotzbach-Piper's
claims of harassment.  Def.'s Mem. Supp. Mot. *In Lim.* to Bifurcate Punitive Damages at 4–5.
Klotzbach-Piper responds that the time that elapsed between her complaints and the initiation of
an investigation indicates malice and recklessness, Pl.'s Opp'n Def.'s Mot. *In Lim.* to Bifurcate
Punitive Damages at 2; elsewhere, she offers a witness who will testify that management was
aware of the abuse yet did not take any action and that, upon hearing reports of Shaw and
Martone's behavior, said they would "grow out of it,"[8]  Pl.'s Proffer Regarding Testimony of
Helen Gage Williamson at 2 ("Pl.'s Proffer"), ECF No. 57.

By asking the Court to hold that Klotzbach-Piper is "barred from presenting evidence at
trial in support of any punitive damages claim" "because the evidence in the record is grossly
insufficient to meet the standard for awarding punitive damages," Amtrak is asking the Court to
weigh the parties' competing evidence and make a determination about the sufficiency of the
evidence in support of Klotzbach-Piper's punitive damages claim.  Def.'s Mem. Supp. Mot. *In
Lim.* to Bifurcate Punitive Damages at 5–6.  But "a motion *in limine* should not be used to
resolve factual disputes or weigh evidence."  *C & E Servs., Inc.*, 539 F. Supp. 2d at 323.  Indeed,
all but one[9] of the cases Amtrak cites in support of its assertion that "the issue of the sufficiency

---

[8] The Court addresses the admissibility of these statements below.  *See infra* Part III.A.4.

[9] One of Amtrak's cases did grant a motion *in limine* to preclude plaintiffs from arguing
for punitive damages (under Pennsylvania law) because the plaintiffs had not identified any
admissible evidence that would establish the employer's state of mind.  *Simmers v. CSX Transp.*,
No. CIV.A. 04-168J, 2006 WL 1698326, at *2 (W.D. Pa. June 19, 2006).  Here, as the Court has
explained, Klotzbach-Piper proffers at least some evidence of Amtrak management's state of
mind.

of the evidence for punitive damages is one that should be resolved prior to consideration by a

jury" involved a court properly evaluating record evidence at the summary judgment stage or

evidence that had been submitted during a jury or bench trial.  Def.'s Mem. Supp. Mot. *In Lim.*

to Bifurcate Punitive Damages at 3–4; *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 469 (6th Cir.

1999) (motion for judgment as a matter of law after trial presentation); *EEOC v. Seelye-Wright of*

*S. Haven, Inc.*, No. 05-CV-677, 2006 WL 2884464, at *7 (W.D. Mich. Oct. 10, 2006) (motion

for summary judgment); *Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 253 (1st Cir. 2000)

(refusal to instruct jury on punitive damages); *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 982–87

(4th Cir. 1997) (renewed motion for judgment as a matter of law after jury punitive damages

award); *Beya v. Hoxworth Blood Ctr.*, 173 F.3d 428 (6th Cir. 1999) (Table Op.) (motion for

judgment as a matter of law); *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1216 (6th Cir. 1996)

(bench trial); *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 495 (8th Cir. 2003) (post-trial

motion for judgment as a matter of law).  It is too late for a motion for summary judgment, *see*

Minute Order of January 19, 2021, and too early for a motion for judgment as a matter of law,

*see* Fed. R. Civ. P. 50(a) (providing that the court may address such a motion "[i]f a party has

been fully heard on an issue during a jury trial").  Klotzbach-Piper may offer evidence and

argument in support of her motion for punitive damages at trial.  Amtrak will have the chance to

respond, and, if it sees fit, move for judgment as a matter of law.

Finally, Amtrak argues that the Court should bifurcate the trial because evidence

regarding punitive damages is wholly distinct from evidence regarding liability, and forcing the

jury to "simultaneously consider" these issues "will only add confusion to the fact-finding

process."  Def.'s Mem. Supp. Mot. *In Lim.* to Bifurcate Punitive Damages at 6.  Amtrak further

contends that argument on punitive damages will make the jury think Amtrak "deserves to be

punished," thereby prejudicing Amtrak's effort to avoid liability on the merits. *Id.* at 6–7.  But the evidence on liability is not necessarily wholly distinct from the evidence on punitive damages; evidence regarding Amtrak management's response to the alleged harassment is relevant both to whether Amtrak was negligent (liability) and whether Amtrak acted with malice or reckless indifference to Klotzbach-Piper's rights (punitive damages).  Moreover, Plaintiffs' proffered evidence on malice/reckless indifference is not especially voluminous or complex. And careful jury instructions will ensure that the jury considers the issues of liability and punitive damages separately.  Accordingly, the Court denies Amtrak's motion to preclude evidence and argument on punitive damages and to bifurcate trial.

4. Amtrak's Motion to Exclude Testimony of Helen Gage Williamson – ECF No. 50

Amtrak initially moved to exclude the testimony of Klotzbach-Piper's co-worker Helen Gage Williamson on various grounds, including that discussion of Gage Williamson's alleged abuse at a Chicago Amtrak location as far back as 2002 was improper "me too" evidence and on the ground that testimony regarding the treatment of other women was hearsay.  Def.'s Mem. Supp. Mot. *In Lim.* to Exclude Testimony of Helen Gage Williamson, ECF No. 50-1.  After prompting at the pretrial conference, Klotzbach-Piper returned with a proffer of a relatively narrow list of topics as to which Gage Williamson will testify.  Pl.'s Proffer.  Notably, this list does not include testimony about Gage Williamson's alleged Chicago abuse.  *Id.* at 2–3.  Amtrak responded with targeted objections to some of these topics.  Def.'s Resp. Pl.'s Proffer.  To start, given Plaintiff's proffer representations, the Court holds that Gage Williamson's testimony shall be limited to those topics identified in Plaintiff's Proffer, subject to the conditions and limitations the Court has discussed in this opinion.  The Court will address each of the proffered topics in turn.

*"That she worked as a conductor on the Jacksonville crewbase at the same time that Ms. Klotzbach-Piper worked at the crewbase"; "That she would work with Ms. Klotzbach-Piper approximately twice a week"; and "that there were no female engineers in Jacksonville." Pl.'s Proffer at 2.* Amtrak does not specifically object to this testimony, and it will provide the foundation for Gage Williamson's personal knowledge and/or perception of some of the proffered topics discussed below. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."); Fed. R. Evid. 701 (stating that a lay witness may provide an opinion only insofar as the opinion is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). Accordingly, Gage Williamson may testify as to these topics.

*"During the time she worked with Ms. Klotzbach-Piper, she saw Phillip Shaw (Amtrak Engineer) give Plaintiff a note and call her a 'stupid bitch'"; "[Gage Williamson] also saw Martone give Karen a card with derogatory writing as well and laugh about it."; and "[Gage Williamson] overheard Shaw and Martone making derogatory comments towards Plaintiff over the radio." Pl.'s Proffer at 2.* Amtrak lodges a specific objection only against the third of these statements, to the extent that it is based on hearsay, but Amtrak also objects generally to any testimony that constitutes hearsay or that is not based on personal knowledge. Def.'s Resp. Pl.'s Proffer at 2–4. The proffered testimony on these topics is based on what Gage Williamson saw, and is not hearsay because it is not offered for the truth of the epithets and derogatory remarks asserted in the remarks or cards. Fed. R. Evid. 801(c) (defining hearsay as an out-of-court

statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement"). Rather, the proffered testimony goes to show the extent and severity of the harassment allegedly directed at Klotzbach-Piper, a matter plainly relevant to her hostile environment claims. Accordingly, Gage Williamson may testify as to these topics.

*"She overhear[d] Richard Nunziato (Amtrak Road Foreman) tell Plaintiff that Shaw and Martone were young and would grow out of it."  Pl.'s Proffer at 2.*  Amtrak repeats its hearsay objection, but once again, this statement is not relevant for the truth of whether Shaw and Martone were in fact young or would in fact grow out of their harassing behavior, but rather for Klotzbach-Piper's attempt to establish that Amtrak management knew about the alleged harassment and negligently failed to prevent or correct it.  *See Klotzbach-Piper*, 2021 WL 4033071, at *17.  Accordingly, Gage Williamson may testify as to this topic.

*"She will testify that Management was aware and did not do anything."  Pl.'s Proffer at 2.*  Amtrak objects that "Plaintiff does not provide a basis for a finding that Ms. Gage Williamson has personal knowledge of management's awareness of an unspecified subject." Def.'s Resp. Pl.'s Proffer at 3.  At this stage, the Court agrees that Klotzbach-Piper has not laid a foundation for a conclusion that this proffered assertion is based on Gage Williamson's personal knowledge and/or is rationally based on her perception.  *See* Fed. R. Evid. 602, 701(a). Moreover, the proffer does not specify whether management was aware of the alleged harassment against Klotzbach-Piper or of something else.  Were Klotzbach-Piper to lay a proper foundation, Gage Williamson's testimony about management's knowledge of the alleged harassment and its response would be relevant to Amtrak's liability.  *See Klotzbach-Piper*, 2021 WL 4033071, at *17.  Accordingly, Gage Williamson may not testify as to this topic unless and until Klotzbach-Piper lays a sufficient foundation to establish Gage Williamson's personal

knowledge and/or rational perception at trial and specifies what management was allegedly aware of. Part of this foundation could include, for example, the proffered testimony regarding Nunziato's "young and would grow out of it" statement discussed above. Plaintiff should be prepared to proffer further foundation for this topic at the next pretrial conference.

*"She will testify that she slapped Shaw because he made a comment about inappropriate noises coming out of her hotel room. He then told her he was physically aroused." and "That she received a Christmas card from Chris Martone (Amtrak Engineer) as well with derogatory writing in it." Pl.'s Proffer at 2.* Amtrak brings another hearsay objection, but again, the Shaw and Martone statements are offered not for their truth but to show their harassing effect. A more apt objection is Amtrak's general objection to "me too" evidence that is irrelevant, prejudicial, and improper under Federal Rule of Evidence 404(b)'s prohibition on the admission of evidence of prior wrongs to show character and conformity. *See* Def.'s Mem. Supp. Mot. *In Lim.* to Exclude Testimony of Helen Gage Williamson at 4–5. These proffered topics tend to show that Shaw and Martone harassed Gage Williamson, not that they harassed Klotzbach-Piper.

Both parties acknowledge that evidence of past discrimination toward an employee other than the plaintiff may be relevant in a Title VII or ADEA case, and that the admissibility of such "'me too' evidence turns on its relevance and unfair prejudice." *Stoe v. Garland*, No. CV 16-1618, 2021 WL 4169313, at *6 (D.D.C. Sept. 14, 2021) (quoting *Holmes-Martin v. Sibelius*, No. CV 07-2128, 2011 WL 13244746, at *3 (D.D.C. Mar. 3, 2011)); *see* Def.'s Mem. Supp. Mot. *In Lim.* to Exclude Testimony of Helen Gage Williamson at 6; Pl.'s Opp'n Def.'s Mot. *In Lim.* to Exclude Testimony of Helen Gage Williamson at 3, ECF No. 54. As the court explained in *Stoe*:

> This inquiry is fact-based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case. When considering the admissibility of "me too" evidence, courts in this District frequently assess: (1) whether the same decisionmakers were involved; (2) whether the witness

and the plaintiff were treated in a similar manner; (3) whether the witness and the plaintiff were otherwise similarly situated; and (4) whether such past discriminatory behavior by the employer is close in time to the events at issue in the case.

2021 WL 4169313, at *6 (citations omitted and cleaned up).  Here, the first three factors weigh in favor of admitting Gage Williamson's testimony about harassment she allegedly faced.  While it makes less sense to ask about "the same decisionmakers," *Stoe*, 2021 WL 4169313, at *6 (citation omitted), in a hostile environment case, Gage Williamson's alleged harassers are the same as Klotzbach-Piper's alleged harassers: Shaw and Martone.  In at least one sense, Klotzbach-Piper and Gage Williamson allegedly were treated in exactly the same way: they both allegedly received derogatory cards from Martone.  Pl.'s Proffer at 2.  More generally, just like Gage Williamson, Klotzbach-Piper allegedly found herself on the receiving end of sexually suggestive comments from Shaw.  *Id.*; *Klotzbach-Piper*, 2021 WL 4033071, at *16.  Klotzbach-Piper and Gage Williamson were similarly situated in that, while they did not hold the exact same role, they both worked on the operation of the same trains as part of the Jacksonville crewbase.  *See* Def.'s Mem. Supp. Mot. *In Lim.* to Exclude Testimony of Helen Gage Williamson at 3; Pl.'s Proffer at 2; Def.'s Resp. Pl.'s Proffer at 2.  However, the proffer does not specify when Shaw and Martone's alleged harassment of Gage Williamson occurred, so the Court is unable to evaluate the "close in time" factor.  *Stoe*, 2021 WL 4169313, at *6 (citation omitted).  Plaintiff should come to the next pretrial conference prepared to explain why Gage Williamson's alleged harassment was sufficiently close in time to Klotzbach-Piper's.  *See id.* at 7 (holding that evidence of "substantial[ly] similar[]" treatment of a co-worker was admissible even though it had "occurred about three years" before the alleged mistreatment of the plaintiff).  Assuming Plaintiff sufficiently so proffers at the next pretrial conference, Gage Williamson may testify as to these topics.

20

*"She will state that she could not tell any difference with Plaintiff driving the trains or others."  Pl.'s Proffer at 3.*  Amtrak objects that this statement could not be based on Gage-Williamson's personal knowledge, because she testified at her deposition she was not stationed in the cab of the train, and therefore would not necessarily know who was driving at a particular time.  Def.'s Resp. Pl.'s Proffer at 3.  Gage Williamson explained that although she normally could tell who was driving the train based on who was calling the signals, she would not have been able to tell if an engineer had taken over the throttle from a trainee driver like Klotzbach-Piper but was still allowing the trainee to call signals.  *Id.* (citing Dep. Helen Gage Williamson at 96:12–98:7, Def.'s Resp. Pl.'s Proffer Ex. 1, ECF No. 59-1).  While Amtrak's point is well taken, it goes at least as much to the weight of Gage Williamson's proffered trial testimony as it does to its admissibility.  Provided that Plaintiff establishes at trial a foundation for Gage Williamson's personal knowledge of who was driving the train at the relevant times, Gage Williamson may testify to the proffered observation at trial.  Plaintiff should be prepared to proffer further foundation for this topic at the next pretrial conference.

*"She will describe an incident involving Plaintiff whereby Shaw ignored her instructions to back up the train."  Pl.'s Proffer at 2.*  Gage Williamson's deposition testimony suggests that her knowledge of this incident may rest on Klotzbach-Piper's hearsay statements.  *See* Dep. Helen Gage Williamson at 96:12–98:7 (testifying that her knowledge of "what may have occurred in the head of the train . . . is all based on information that" she heard from Klotzbach-Piper).  To the extent this proffered testimony is not based on hearsay, it would be relevant to establishing the working relationship between Klotzbach-Piper and one of her alleged harassers.  Accordingly, at the pretrial conference, Klotzbach-Piper shall make a further proffer as to the

admissibility of this testimony consistent with the rule against hearsay.  If this testimony is not based on hearsay, Gage Williamson may provide it at trial.

"She will testify that the male engineers would exaggerate the mistakes when women did them and ignore them when men did it" and "She will state that she was told that Amtrak was a man's job."  Pl.'s Proffer at 3.  These proffered topics are simply too vague for the Court to opine on their admissibility at this stage.  For example, the Court does not know which women made the mistakes described in the first statement, and, if women other than Klotzbach-Piper, whether the Stoe factors discussed above would counsel admission of male engineers' responses to their mistakes as "me too" evidence.  Nor does the Court know who allegedly told Gage Williamson that Amtrak is a man's job, and, accordingly, whether this testimony should be excluded under the hearsay rule.  At the next pretrial conference, Plaintiff must provide further foundation for the relevance of these topics, their admissibility notwithstanding the hearsay rule, and Gage Williamson's personal knowledge of these topics.[10]  The Court will defer its ruling on the admissibility of Gage Williamson's testimony on these topics until then.

### B.  Plaintiff's Motion to Exclude Defense Exhibits 3, 4, and 5 – ECF No. 46

Klotzbach-Piper filed only one motion in limine, which seeks the exclusion of defense Exhibits 3, 4, and 5.  These exhibits present the notes Amtrak EEO Compliance Office investigator Shazrae Mian took when interviewing Klotzbach-Piper (Exhibit 3), foreman Richard Nunziato (Exhibit 4), and Phillip Shaw (Exhibit 5).  Mem. Supp. Pl.'s Mot. In Lim. at 1–3, ECF No. 46-1.  Klotzbach-Piper presents relevance, authenticity, and hearsay objections.  Id.

---

[10] At least on the current record, the Court does not agree with Amtrak that testimony on the "exaggerate mistakes" topic would be improper lay opinion testimony.  Contrary to Amtrak's suggestion, Gage Williamson did not need to have "knowledge regarding the training program for Locomotive Engineers" in order to observe differences in supervisor reactions to male and female trainees who made the same mistakes.  See Def.'s Resp. Pl.'s Proffer at 3.

The relevance and authenticity objections are easily disposed of.  Without citation, Klotzbach-Piper argues that these interviews cannot be relevant to her claims because they took place after the alleged harassment and after "Plaintiff was terminated and removed from service."  *Id.* at 2.  But the circumstances surrounding Amtrak's investigation of and response to the alleged harassment are plainly relevant to Klotzbach-Piper's hostile environment claims against Amtrak, which require proof that "that the employer was at least negligent in not preventing or correcting the harassment."  *Klotzbach-Piper*, 2021 WL 4033071, at *17 n.8 (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013)).

As for authenticity, Mian will testify and authenticate her notes from each interview. Def.'s Opp'n Pl.'s Mot. *In Lim.* at 4–5, ECF No. 45; *see* Fed. R. Evid. 901.  Klotzbach-Piper complains that the notes are not "original," Mem. Supp. Pl.'s Mot. *In Lim.* at 2; *see* Fed. R. Evid. 1002, but they apparently are printouts of notes taken only in electronic form, *see* Def.'s Opp'n Pl.'s Mot. *In Lim.* at 5, and therefore qualify as original, *see* Fed R. Evid. 1001(d) ("For electronically stored information, 'original' means any printout—or other output readable by sight—if it accurately reflects the information.").  Klotzbach-Piper objects that she "does not recall using" the words found in the notes of her own interview, Mem. Supp. Pl.'s Mot. *In Lim.* at 2, but this complaint goes to the weight of the evidence rather than to its admissibility.

The hearsay question is a bit more complicated.  Mian's interview notes raise the specter of hearsay within hearsay—that is, "hearsay that contains within it another level or levels of hearsay."  29 Am. Jur. 2d Evidence § 695 (Blum et al. 2022).  Indeed, there are potentially multiple levels of hearsay involved here: the notes are Mian's out-of-court accounts of her interviewees' statements, which in turn also purport at times to relay what other individuals told those interviewees or what certain records stated.  For each level of hearsay to be admitted, it

must be covered by either an exemption or exception to the hearsay rule.  Fed. R. Evid. 805

("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined

statements conforms with an exception to the rule."); *see United States v. Slatten*, 865 F.3d 767,

804 n. 7 (D.C. Cir. 2017).

Neither Klotzbach-Piper nor Amtrak specifically addresses this multiple hearsay issue,

but Amtrak contends that Mian's notes (presumably, encompassing both her questions and the

interviewees' answers) may be admitted either because: (1) they fall under the business records

exception to the hearsay rule, Def.'s Opp'n Pl.'s Mot. *In Lim.* at 4; *see* Fed. R. Evid. 803(6); or,

in the alternative, (2) Amtrak offers them not for the truth of the matters asserted therein, but

rather as "evidence of the sufficiency of Amtrak's investigation and response to Plaintiff's

complaint, which goes to whether Amtrak can be held liable for the conduct of Plaintiff's

coworkers,"  Def.'s Opp'n Pl.'s Mot. *In Lim.* at 3–4; *see* Fed. R. Evid. 801(c)(2).

As a first step, the Court applies these arguments to the initial level of potential hearsay:

Mian's notes, which are her out-of-court statements.  In explaining the exception for regularly

kept records, which has also been called the business records exception, the D.C. Circuit has

stated that "'[d]ouble hearsay exists when a business record is prepared by one employee from

information supplied by another employee,'" and is "excepted from the hearsay rule provided

'both the source and the recorder of the information, as well as every other participant in the

chain producing the record, are acting in the regular course of business.'"  *United States v. Gurr*,

471 F.3d 144, 151–52 (D.C. Cir. 2006) (quoting *United States v. Baker*, 693 F.2d 183, 188 (D.C.

Cir. 1982)).  That is, "[t]he hearsay in records of regularly conducted activity is admissible 'only

if it was reported to the maker [of the report] directly or through others, by one who is himself

acting in the regular course of business, and who has personal knowledge.'"  *Gurr*, 471 F.3d at

151 (quoting *United States v. Smith*, 521 F.2d 957, 964 (D.C. Cir. 1975)).  Amtrak alleges that

Mian's "interviews were conducted as a regular business practice in response to Ms. Klotzbach-

Piper's concerns being forwarded to the EEO Compliance Office," and "[i]t is the investigators'

practice to take notes of interviews that are conducted, and the notes are retained as business

records."  Def.'s Opp'n Pl.'s Mot. *In Lim.* at 4.  But Amtrak cannot demonstrate that Klotzbach-

Piper, Nunziato, or Shaw—as additional participants of the "chain producing the record," *Gurr*,

471 F.3d at 152—were themselves in the regular course of business in making statements to

Mian.  *See, e.g.*, *United States v. Lemire*, 720 F.2d 1327, 1351 (D.C. Cir. 1983) ("We think that

memoranda prepared as part of an investigation into substantial abnormal procedures are not

prepared for a regular business purpose.  We find such memoranda similar to accident reports,

which generally are not admissible as business records.").  In *United States ex rel. Barko v.*

*Halliburton Co.*, 709 F. App'x 23 (D.C. Cir. 2017), the plaintiff appealed the district court's

treatment of reports "of KBR employees alleging misconduct by KBR supervisors."  *Id.* at 24.

The district court had deemed these reports—which detailed alleged fraud that was reported to

the defendant KBR in accordance with the defendant's policy and that the defendant was

required to investigate under the terms of its contract to provide services and materials to the

U.S. government during the war in Iraq, *United States ex rel. Barko v. Halliburton Co.*, 241 F.

Supp. 3d 37, 43–45 (D.D.C. 2017)—to contain "inadmissible hearsay," *Barko*, 709 F. App'x at

24.  The D.C. Circuit agreed, stating that the plaintiff's "invocation of the business records

exception fails because he ha[d] not shown that the individuals who reported misbehavior did so

as part of their 'regularly conducted activity' working for KBR." *Barko*, 709 F. App'x at 24.

Likewise, Amtrak cannot show that Klotzbach-Piper, Nunziato, or Shaw made their statements

in these interviews about Klotzbach-Piper's misconduct allegations as part of their regularly conducted activity in operating or managing the operation of trains for Amtrak.

Further, the D.C. Circuit has recognized a "litigation records" doctrine "applied to deny the business records exception to any document prepared with an eye toward litigation when offered by the party responsible for making the record." *United States v. Smith*, 521 F.2d 957, 966 (D.C. Cir. 1975). But even if Mian's interview notes "may not have been prepared in anticipation of litigation . . . they were prepared with a particular client and goal in mind, which raises similar concerns about their trustworthiness." *United States ex rel. Landis v. Tailwind Sports Corp.*, 292 F. Supp. 3d 211, 220–21 (D.D.C. 2017). For these reasons, the business records exception does not apply.

Nevertheless, the Court finds that the first level of potential hearsay is not hearsay because Amtrak offers the notes to demonstrate the "sufficiency of Amtrak's investigation and response to Plaintiff's complaint." Def.'s Opp'n Pl.'s Mot. *In Lim.* at 4. As previously explained, hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement". Fed. R. Evid. 801(c). The mere existence of the notes goes to show what investigatory steps Amtrak undertook in response to Klotzbach-Piper's claims; further, Mian's questions (and any quotes from others embedded within those questions) as memorialized within the notes serve as evidence of the scope and thoroughness of that investigation, rather than to prove the truth of the matters asserted in those statements. Thus, the pertinent issue here is whether Klotzbach-Piper, Nunziato, and Shaw's statements to Mian as recorded in the notes are hearsay because they have been offered to prove the truth of the matters asserted therein.

At this next level of hearsay—Klotzbach-Piper, Nunziato, and Shaw's out-of-court statements to Mian—the analysis diverges into two paths: one for Nunziato and Shaw's statements, and the other for Klotzbach-Piper's, which the Court assesses in turn.  Though Amtrak did not address the different levels of hearsay and why Nunziato and Shaw's statements should be admitted, the Court construes Amtrak's existing argument to mean that Amtrak is not seeking to prove the truth of the matters asserted in Nunziato and Shaw's interview statements, which should instead come in as evidence as to the sufficiency of Amtrak's investigation.  *See* Def.'s Opp'n Pl.'s Mot. *In Lim.* at 3–4.  The problem is that the notes of Nunziato and Shaw's respective interviews in particular are replete with statements that go well beyond Amtrak's legitimate interest in offering evidence demonstrating the extent of its investigative response and veer instead into refuting Klotzbach-Piper's accounts of harassment and her complaints to supervisors.  *See, e.g.*, Def.'s Ex. 4 at 3–4 (Nunziato disagreeing with certain of Klotzbach-Piper's allegations); Def.'s Ex. 5 at 2–3 (Shaw denying certain of Klotzbach-Piper's allegations).  Because of the risk that these statements will confuse the jury as to the issues that remain under consideration in this case and that the jury will consider Nunziato and Shaw's statements for the truth of their disputes of Klotzbach-Piper's claims, the "probative value [of admitting Nunziato and Shaw's statements] is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  The potential prejudice to Amtrak is minimized given that Amtrak has listed Nunziato and Shaw as witnesses who may testify about Amtrak's investigation, so, to the extent Amtrak would have used Nunziato and Shaw's statements to demonstrate the sufficiency of that investigation, Amtrak will have an opportunity to tread this ground with Nunziato and Shaw at the trial (subject to hearsay

objections made at the trial).[11]  Pretrial Statement at 4–5.  Accordingly, Mian's notes from her

interviews with Nunziato and Shaw, Defense Exhibits 4 and 5, will be excluded as evidence.

Klotzbach-Piper's out-of-court statements, in turn, may—to the extent that they are not

recounting someone else's out-of-court statements—be admitted as the statements of an

opposing party.  Fed. R. Evid. 801 ("The statement is offered against an opposing party and . . .

was made by the party in an individual or representative capacity . . . ."); *see Stehn v. Cody*, 74 F.

Supp. 3d 140, 147 (D.D.C. 2014).  But Klotzbach-Piper is at times also recounting the statements

of others.  *See, e.g.*, Def.'s Ex. 3 at 3 ("[Banks] explained that he had received the same type of

hazing/harassment tx [sic] when he came to JAX as outsidet [sic] engineer."); *id.* at 3–4

(recounting details and statements from forms); *id.* at 7 ("[Mark Kenny] said unless I actually

violate a rule, the train handling is subjective to the person evaluating you.").  There are

numerous statements within the notes from Klotzbach-Piper's interview that may be an

additional level of hearsay, and which the parties have not specifically identified or addressed in

their respective filings.

Accordingly, on or before November 11, 2022, both parties will: (1) specifically identify

statements within the notes from Klotzbach-Piper's interview, Defense Exhibit 3, in which

Klotzbach-Piper recounts the out-of-court statements of others; and (2) make an argument as to

whether each of those statements should be admitted into evidence.  The parties may do so in

---

[11] Along similar lines, it is unclear why Nunziato and Shaw's other statements, which are less related to refuting Klotzbach-Piper's allegations, should be admitted into evidence.  Such prior consistent statements in the notes would not fall under Federal Rule of Evidence 801(d)(1)(B)'s carveout of such statements from the definition of hearsay unless they are offered to rebut a charge of recent fabrication or recent improper influence or motive (or another attack on credibility).

whatever format they so choose, such as a list and/or proposed redactions.  The Court will therefore defer its ruling on the admissibility of Defense Exhibit 3 until the pretrial conference.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Exclude Evidence of Dismissed Claims and Economic Damages (ECF No. 48) is **GRANTED** without prejudice to reconsideration; Defendant's Motion to Exclude Dismissed Claims and Economic Damages (ECF No. 49) is **GRANTED IN PART AND DENIED IN PART**; Defendant's Motion to Preclude or Bifurcate Punitive Damages (ECF No. 47) is **DENIED**; the Court **DENIES IN PART** Defendant's Motion to Exclude Testimony of Helen Gage Williamson (ECF No. 50) and the Court defers until the next pretrial conference a ruling on the remainder; and Plaintiff's Motion to Exclude Defense Exhibits 3, 4, and 5 (ECF No. 46) is **GRANTED IN PART** and the Court defers until the next pretrial conference a ruling on the remainder.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  October 12, 2022                                      RUDOLPH CONTRERAS
                                                                          United States District Judge